**Megan Renee HEDGES and Keith Hedges, By and Through their parents and next best friends, Kenneth and Nancy HEDGES, and Amy Nichole Lewis, By and Through her parents and next best friends, Richard and Audrey Lewis, Plaintiffs,**

v.

**WAUCONDA COMMUNITY UNIT SCHOOL DISTRICT NO. 118, Dr. H. Darrell Dick, Superintendent, and Christine Golden, Principal of Wauconda Junior High School, Defendants.**

No. 90 C 6604.

United States District Court,
N.D. Illinois, E.D.

Oct. 28, 1992.

Charles E. Hervas, James Gus Sotos, Schirott & Associates, P.C., Itasca, IL, for plaintiffs.

William W. Kurnik, Kurnik, Cipolla, Stephenson & Barasha, Arlington Heights, IL, Stanley Bert Eisenhammer, Alice Moekle Ralph, Robert A. Kohn, Hodges, Loizzi, Eisenhammer, Rodick & Kohn, Arlington Heights, IL, for defendants.

## MODIFIED MEMORANDUM OPINION AND ORDER

PLUNKETT, District Judge.

In 1990 Wauconda Junior High School promulgated a policy prohibiting student distribution of religious materials on school property. One of its students challenged this policy on the grounds that it violated her First Amendment right to freedom of

speech. We agreed with the student and entered an order preliminarily enjoining the school district from enforcing the policy. The district subsequently revised its policy. The new policy no longer barred religious materials per se; instead, it barred the distribution of, among other things, religious materials that other students could reasonably believe was school sponsored and materials not primarily prepared by a student or concerning nonschool-sponsored events. The policy also placed certain time, place, and manner restrictions on the distribution of the materials that were allowed under the policy. The student, together with her brother and a friend, filed an amended complaint challenging this new policy on the grounds that it violated their First Amendment rights to freedom of speech.

On October 18, 1991, we issued a memorandum opinion and order in which we held that the Wauconda Junior High School is a closed forum and that the new policy was reasonable and that it was not a facade for viewpoint-based discrimination. The Plaintiffs filed a timely motion for a new trial or alternatively for an amendment of our judgment, requesting that we reconsider our decision that the junior high school was a closed public forum. We agreed to reconsider our decision and to allow the parties to engage in further discovery directed solely at the forum issue. Discovery and briefing are now complete.

After considering the parties' submissions, we have decided to amend our judgment as follows. First, we conclude that despite some uncertainty in Supreme Court and federal appellate court precedent, we properly found that Wauconda Junior High School was a closed forum. Second, the requirement in the new policy that only student-prepared material be distributed is unreasonable and consequently must be deleted. Third, the policy's time, place, and manner restrictions are invalid because in their current incarnation, these restrictions actually create the appearance of school sponsorship of student-distributed religious materials. Fourth and finally, we award damages to the Plaintiffs in the amount of ten dollars.

*Background* [1]

When this action was filed, Megan Hedges was a thirteen-year-old, eighth-grade student at the Wauconda Junior High School and a member of the Wauconda Evangelical Free Church, both located in Wauconda, Illinois. Megan, who was quite active in her church, volunteered to distribute copies of a religious publication, *Issues and Answers*, at the junior high school. Megan and her family share a strong religious faith, and given the testimony of Megan's parents and the pastor of their church, it is clear that Megan wants to distribute copies of *Issues and Answers* as a way of "sharing her faith" with others.

On November 2, 1990, Chris Dawson, the church youth group leader, arranged for the distribution to take place on the sidewalk in front of the school before the school day began. Megan and several other students distributed approximately 100 copies of the October issue of *Issues and Answers* to Wauconda Junior High School students as they arrived at school that morning. Megan testified that not one student who was offered a copy of *Issues and Answers* refused to take it. In fact, several students approached Megan and asked to help distribute the issues.

The school principal, Christine Golden, noticed students reading *Issues and Answers* inside the school. She became concerned, after examining the publication, with certain references it made to satanism and *Playboy* magazine, and began collecting copies from students in her immediate area. She then contacted Dr. H. Darrell Dick, superintendent of the Wauconda Community School District, for further direction. Superintendent Dick directed Principal Golden to determine who distributed the publication and told her to give that person a copy of the School District's

1. Readers already familiar with our October 18, 1991 Memorandum Opinion and Order may wish to skip the bulk of this discussion as it is identical to that laid out in the background section of that opinion. The new material begins at the heading "Hedges III", *infra* at 451.

Leaflet Distribution Policy ("Original Policy").

## A. The Original Policy

That policy, which became effective on November 1, 1990,[2] provided in part (with emphasis added):

(4) Only students of Wauconda Community School District No. 118 are permitted to engage in the distribution of material on school grounds.

. . . .

(7) Distribution of written material that is obscence [sic] or pornographic, pervasively indecent and vulgar, libelous, invades the privacy of others or will cause substantial disruption of the proper and orderly operation of the school or school activities shall be prohibited. At the elementary and junior high school, *written material that is of a religious nature is also prohibited.* Students distributing such material shall be subject to discipline by the school administrators and/or the Board of Education.

On November 13, 1990, Plaintiff Megan Hedges, by and through her parents and next best friends, Kenneth and Nancy Hedges, filed a two-count complaint against District Superintendent Dick, Principal Golden, and the Wauconda Community Unit School District No. 118 ("School District"). The Complaint sought a declaration that the restrictions imposed by the Defendants, which would prevent Megan Hedges from distributing *Issues and Answers* within the school, were unconstitu-

tional on their face, or, in the alternative, were unconstitutional as applied to the Plaintiff. Specifically, Hedges alleged that Section 7 of the Original Policy violated her First Amendment rights of freedom of speech and association. In addition, she requested an injunction prohibiting the Defendants from enforcing the Original Policy so that she would be allowed to distribute *Issues and Answers* pursuant to the time, place, and manner restrictions contained in the Original Policy. The Complaint also sought money damages.

A few days later, Plaintiff moved for a temporary restraining order to enjoin the Defendants from enforcing the Original Policy's prohibition on distributing material "of a religious nature." We denied Plaintiff's motion, but ordered expedited discovery. The Plaintiff filed a motion for a preliminary injunction, which also sought to enjoin the enforcement of Section 7 of the Original Policy. At a two-day hearing on the motion, we heard testimony and the arguments of counsel.

## B. *Hedges I*

In an opinion of December 21, 1990 (*Hedges I*), we granted Plaintiff's Motion for a Preliminary Injunction.[3] In particular, we found that Megan Hedges had demonstrated that she would suffer irreparable injury absent injunctive relief and that she had a very strong probability of success in demonstrating that her distribution of *Issues and Answers* did not violate Section 4 of the District's policy.[4] *Hedges I*, Mem.

---

**2.** In a December 21, 1990 opinion, we found that, although the issuance of the policy occurred the day before Megan Hedges' distribution of *Issues and Answers*, "there is no evidence, and plaintiff does not argue, that the ... Policy ... was created or implemented to prevent Megan Hedges' attempted distribution." *Hedges v. Wauconda Commun. Unit Sch. Dist.,* (*Hedges I*) No. 90–C–6604, mem. op. & ord. at 6 n. 3, 1991 WL 2458 (N.D.Ill. Dec. 21, 1990). Thus, the timing was "purely coincidental." *Id.*

**3.** Defendants subsequently filed a Motion to Dissolve the Preliminary Injunction. We denied this motion. *Hedges v. Wauconda Commun. Unit School Dist.,* minute order (N.D.Ill., Jan. 14, 1991). Defendants appealed this denial. The Court of Appeals dismissed the appeal on April 2, 1991.

**4.** Section 4 states that only Wauconda Junior High School students may distribute materials at the school. Dr. Dick testified that Plaintiff's distribution of *Issues and Answers* on November 2, 1990, violated Section 4, as well as Section 7. (Dick Aff. at 1–2.) Superintendent Dick maintained and Defendants contended that Megan Hedges was merely a conduit for outsiders who wished to distribute *Issues and Answers* at the school. They argued that the distribution was orchestrated by nonstudents and thus, constituted distribution by nonstudents. In finding that Megan Hedges had a genuine personal desire to distribute the publication as a way of sharing her faith, we rejected Defendants' arguments.

Op. at 23, 12. We also examined her chances of successfully challenging Section 7 and found that, although the Defendants probably could demonstrate a compelling state interest in prohibiting the distribution of some religious materials, the policy's blanket prohibition on all religious material was unconstitutionally overbroad. *Id.* at 20, 22. In reaching this conclusion, we employed a public forum analysis and made the preliminary—but what we now believe to be mistaken—determination that the Defendants had abandoned their earlier position that the school was a closed forum.

### C. New Policy

In response to our opinion in *Hedges I,* the School District promulgated a new regulation (effective January 7, 1991). This policy, which was entitled "Interim Distribution Policy" ("New Policy"), reads (with emphasis added):

#### A. GENERALLY

It is beneficial to the educational mission of the school for junior high school students to express their own views concerning a wide variety of topics and issues and share them with other students in the school, even when these views may be unpopular or controversial. The student's right to express their own views in the school, however, are not coextensive with the rights of adults or even children in other settings and must be exercised in light of the special characteristics of the school environment. The school has the duty to insure that the manner in which these views are expressed and the views themselves do not conflict with the basic educational mission of the school. Therefore, student expression which may be disruptive of the orderly operation of the school or school activities, which violates the rights of others, which is socially inappropriate or inappropriate due to the maturity level of the students, or which expresses religious beliefs or points of view that students would reasonably believe to be sponsored, endorsed or given official imprimatur by the school will not be permitted.

#### B. STUDENT DISTRIBUTION OF NON–SCHOOL SPONSORED WRITTEN MATERIAL IN SCHOOL OR ON SCHOOL GROUNDS

When any student or students, who as an individual or a group, seek to distribute more than 10 copies of the same written material on one or more days in the school or on school grounds, they must comply with the following procedures:

1. At least 24 hours prior to any distribution of material, the student shall notify the principal of his/her intent to distribute.

2. Material shall be distributed between 7:15 a.m. and 7:45 a.m. and 3:15 p.m. and 3:45 p.m. from a table to be set up by the school for such purposes. The table shall be located at or near the main entrance of the building. No more than two students distributing the same material shall be seated at the table.

3. Only the same material may be distributed during morning hours or afternoon hours. Priority for distribution will be determined on a first come, first served basis.

4. Distribution must be done in an orderly and peaceful manner. Distribution which is coercive so as to affect the free exercise of any person's right to accept or reject any offered material shall be prohibited.

5. The distribution shall be conducted in a manner which does not cause additional work for school personnel. Therefore, students shall be responsible for cleaning up any materials thrown on the floors or left on tables.

6. *Students shall not distribute written material:*

a. which will cause substantial disruption of the proper and orderly operation and discipline of the school or school activities;

b. which violates the rights of others, including but not limited to material that is libelous, invades the privacy of others, infringes on a copyright;

c. which is socially inappropriate or inappropriate due to the maturity level of the students, including but not limited to material that is obscene, pornographic,

pervasively lewd and vulgar or contains indecent and vulgar language;

d. which is primarily of a commercial nature including but not limited to all material that primarily seeks to advertise for sale products or services;

e. *which expresses religious beliefs or points of view that students would reasonably believe to be sponsored, endorsed or given official imprimatur by the school* including but not limited to

(1) religious objects of worship [sic], prayers, tracts, commentaries, Bibles, scriptures, and religious literature of a particular religious faith or organization which promulgate the teaches [sic] of the faith or organization whether in its original form or recopied in whole or part by the students;

(2) any religious material which represents an effort to proselytize other students; and

(3) any religious material whose format would lead students to believe that the material is sponsored or endorsed by the school.

7. *Because non-school sponsored organizations and non-students are prohibited from distributing material in schools or on school grounds, students are also prohibited from distributing written material which is primarily prepared by non-students or which concerns the activities, or meetings of a non-school sponsored organization.*

8. If a student is prevented from distributing written material on the grounds that he/she violated this policy, the student may appeal the decision to the Superintendent by notifying the Principal. The Superintendent or his designee shall render a decision within 24 hours. The student may appeal the Superintendent's decision to the Board of Education by notifying the Principal or Superintendent. The Board or a committee of the Board shall meet to review the Superin-

tendent's decision within three days of the Superintendent's decision and render a decision. If the committee of the Board makes the decision, the full Board shall review the decision of the committee at its next regularly scheduled Board meeting and issue a decision. In the event the Superintendent, Board committee, or Board fails to make a decision in the time required, the student may resume distribution and continue to distribute the material until a decision is made.

On January 8, 1991, Megan Hedges, pursuant to the New Policy, requested permission of Defendants to distribute *Issues and Answers* as well as copies of a "position paper" prepared by Megan and her family, which quotes the First Amendment and a speech given by President Lincoln referring to God, and which states "I Believe in God, Won't You?" Principal Golden refused to permit the distribution of more than ten copies of *Issues and Answers*,[5] but allowed the distribution of the position paper. Pursuant to the New Policy only two students were allowed to sit behind the distribution table. (Am.Compl. ¶¶ 23, 25, 29, 30.)

On February 21, 1991, Megan Hedges sought permission under the New Policy to distribute a flyer to fellow students advertising an activity, known as "Operation Dessert Shield," to be held at the Wauconda Evangelical Free Church. The activity was a campaign to send postcards to service men and women in the Persian Gulf. The Operation Dessert Shield flyer also mentioned other activities such as floor hockey, volleyball, a movie, and ice cream. The flyer contained no religious content, aside from the fact the activity was to be held at a local church. (Am.Compl. ¶¶ 29–31.) On February 22, 1991, Principal Golden advised Megan Hedges that distribution of the flyer was prohibited under the new rules.[6] (Am.Compl. ¶ 32.)

---

5. Plaintiffs were allowed to distribute ten copies of *Issues and Answers* because the New Policy only applies to the distribution of more than ten copies of student material. (Am.Compl. ¶ 28.)

6. The Amended Complaint does not allege which portion of the New Policy would be violated by such a distribution. We assume it is Section B–7's prohibition of written materials that concern the activities of nonschool-sponsored organizations.

## D. The Amended Complaint

■ On March 4, 1991, Megan Hedges filed an amended complaint that added her brother Keith Hedges and a schoolmate, Amy Lewis, as complainants. In addition to these two students, the Amended Complaint sought to add a class of the approximately 300 students of Wauconda Junior High School; thus, this action was newly asserted as a class action.[7] This Amended Complaint requested declaratory relief, injunctive relief, and damages pursuant to 42 U.S.C. §§ 1983 and 1988, for the deprivation of rights under the Constitution of the United States, and pursuant to the Illinois Constitution. The Wauconda Community School District, Superintendent Dick, and Principal Golden were named as Defendants. Both Superintendent Dick and Principal Golden were named individually and in their official capacities.

The Amended Complaint asserted that the New Policy (1) was an impermissible prior restraint; (2) was void for vagueness; (3) was overbroad and not justified by a compelling state interest; (4) gave school authorities unfettered discretion and permitted unequal enforcement; (5) constituted "merely a content based tool of discrimination specifically designed at banning all forms of religious speech"; (6) contained unconstitutional restrictions on time, place, and manner of distribution; (7) improperly limited the distribution of nonreligious literature; and (8) banned all religious literature in direct violation of the students' constitutional rights of freedom of religion.

(Am.Compl. ¶ 33.) Moreover, it alleged that the Original Policy,[8] which prohibited the distribution of all "material which is of a religious nature," violated their constitutional rights to freedom of speech and freedom of religion. (*Id.*)

## E. Hedges II and the Remaining Claims

Defendants moved to dismiss Plaintiffs' Amended Complaint. On June 11, 1991, we issued an opinion (*Hedges II*) granting Defendants' motion in part and denying it in part. We dismissed the Plaintiffs' prior restraint, vagueness, freedom of religion, and unfettered discretion claims, as well as their challenges to Section B–6's restraints on nonreligious speech.

After our decision in *Hedges II*, the only claims remaining with respect to the Policy are that Section B–2 (time, place, and manner restrictions), Section B–7 (prohibitions on material primarily prepared by nonstudents or concerning the activities of a non-school-sponsored organization), and Section B–6(e) (prohibition on religious material that students could reasonably believe are school sponsored or endorsed) are unconstitutional.[9] Plaintiffs' claim for a permanent injunction against the enforcement of the Original Policy on the grounds that it too is unconstitutional also survived the motion to dismiss.

A two-day bench trial was held on the remaining claims. Both Plaintiffs and Defendants presented expert testimony. The Court also heard testimony from the indi-

7. Although Plaintiffs asserted their Amended Complaint as a class action, they never moved to certify the class. After reviewing the evidence, we find that the proposed class fails the requirement of Federal Rule of Civil Procedure 23(a)(4). "It is axiomatic that a putative representative cannot adequately protect the class if his interests are antagonistic to or in conflict with the objectives of those he purports to represent." 7A Wright, Miller, & Kane, *Federal Practice and Procedure: Civil 2d* § 1768 (1986). In this case, some students at Wauconda Junior High School may wish to see the New Policy upheld. As the Court in *Tinker* recognized students have a "right to be secure and to be let alone." *Tinker v. Des Moines Indep. Commun. Sch. Dist.*, 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969). Some students, for example those holding different religious beliefs or

who are atheistic, may have interests that are antagonistic to the Plaintiffs, who are seeking to have the New Policy struck down insofar as it prohibits the distribution of religious materials such as *Issues and Answers*. For this reason, we refuse to certify the class proposed in Plaintiffs' Amended Complaint.

8. Although this Original Policy is no longer in force, Plaintiffs want us to enjoin permanently its enforcement by the School District.

9. Since we dismissed Plaintiffs' claim that the New Policy violated their First Amendment right to freedom of religion, the constitutional challenge to the New Policy is based entirely on the First Amendment's guarantee of freedom of speech.

viduals involved and accepted into evidence various publications circulated by the school as well as the materials that Megan Hedges sought to distribute at the school.

### F. Hedges III

On October 18, 1991, we issued a memorandum opinion and order, 1991 WL 222163, (*Hedges III*) upholding the New Policy but entering a permanent injunction against the enforcement of the Original Policy. Based on our earlier conclusion in *Hedges I* that the public forum analysis applied, we began by examining what type of forum Wauconda Junior High School constituted. We explained that we had erred in *Hedges I* when we asserted that the parties had agreed to classify the school as a limited public forum and that in fact the Defendants actively contested that classification. In light of the evidence adduced during the hearings and presented in the briefs, we concluded that the junior high school was a closed forum.

As will be discussed in greater detail later, regulations governing speech in a closed forum must only pass a reasonableness test, not the more demanding strict scrutiny test. Consequently, we proceeded to consider whether the challenged portions of the New Policy were reasonable. We concluded that Section B–7's prohibition on the distribution of material not primarily prepared by a student was reasonable given the School District's desire to enhance students' educational experience. We stated that the school could believe that its educational mission was best served by forcing the students to articulate their ideas in their own words or through their own preparations. We also concluded that Section B–7's ban on the distribution of materials concerning events or activities of nonschool-sponsored organizations was reasonable given that school-related activities take precedence at the school and that administrators might well wish to prohibit advertisements for activities sponsored by organizations with which it was not familiar.

We determined that Section B–6(e), which prohibits the distribution of religious material that could be mistakenly identified as school sponsored or endorsed, was reasonable in light of the school's obvious interest in avoiding any Establishment Clause problems. With respect to this conclusion, we began by noting that although Section B–6(e) could plausibly be read as prohibiting the distribution of all religious materials—in light of the numerous items listed in subsection 1—defense counsel had stipulated in open court that each of the subsections is subject to the introductory clause and that each was added for illustrative purposes only. Under this interpretation, we explained, only the religious materials listed in the subsections that students would reasonably believe to be sponsored, endorsed, or given official imprimatur by the school are prohibited; materials listed in the subsections that could not be so confused are not prohibited. As a consequence, subsection B–6(e)(3) is redundant. Throughout this litigation, we have continued to interpret Section B–6(e) in this manner.

As for the section's reasonableness, we explained that after listening to expert testimony, reviewing the format and content of materials sponsored and distributed by the school, and comparing these publications with *Issues and Answers*—the only material whose distribution had been banned under this section—the School District could reasonably be concerned that students might believe that *Issues and Answers* was school sponsored or school endorsed. We concluded that because the school had a duty to ensure that no Establishment Clause problems would arise, Section B–6(e)'s restriction was a reasonable one. Finally, we held that the New Policy's time, place, and manner restrictions were reasonable and that the policy, as a whole was not a facade for viewpoint-based discrimination.

### G. *Plaintiff's Motion to Amend*

After we issued our October 18, 1991 opinion, Plaintiffs timely moved for a new trial or, in the alternative, for us to amend or alter our judgment. Plaintiffs also requested that we reopen discovery on the

forum issue. In October 1991 we granted their request to reopen discovery on the narrow issue of the nature of the forum at Wauconda Junior High School. This discovery has now been completed and both parties have submitted their briefs on the forum issue. In their supporting memorandum, Plaintiffs argue not only that the school is a limited public forum, but that it was improper for us to engage in the forum analysis at all. They contend that the *"Tinker* Test," which is described below, is the only proper way to analyze restrictions on student speech.

### Analysis

■ We begin our analysis here as we did in *Hedges III* with the threshold question posed in any suit alleging a violation of the First Amendment guarantee of freedom of speech,[10] namely whether the speech at issue is protected under the amendment. *See United States v. Kokinda,* 497 U.S. 720, 723–25, 110 S.Ct. 3115, 3118, 111 L.Ed.2d 571 (1990); *Cornelius v. NAACP Legal Defense & Educ. Fund,* 473 U.S. 788, 797, 105 S.Ct. 3439, 3446, 87 L.Ed.2d 567 (1985). Some of the speech at issue in our case is religious speech (e.g., *Issues and Answers* ). We reiterate that there is "no question that religious discussion and worship are forms of speech and association protected by the first amendment," *Gregoire v. Centennial School District,* 907 F.2d 1366, 1370 (3rd Cir.1990) (citing *Widmar v. Vincent,* 454 U.S. 263, 269, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981)), *cert. denied,* — U.S. —, 111 S.Ct. 253, 112 L.Ed.2d 211 (1990); *see also Bell v. Little Axe Independent School District,* 766 F.2d 1391, 1400 (10th Cir.1985), and that speech is no less protected because it is religious in nature. *See Heffron v. International Soc'y for Krishna Consciousness,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981).

■ The other speech at issue here is also protected. The New Policy prohibits the distribution of materials not primarily prepared by students and materials concerning "activities, or meetings of a non-school sponsored organization." Because materials can only be distributed by students, we assume that these banned materials constitute student speech by virtue of their apparent adoption by the student who wishes to distribute them. It is by now axiomatic that students do not shed their rights of freedom of speech or expression at the schoolhouse door. *Tinker v. Des Moines Indep. Commun. Sch. Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). Thus, it seems clear that the speech, both religious and nonreligious, at issue in this case is protected.

### A. Which Analysis Should We Apply?

Given that the speech at issue here is protected under the First Amendment, "we must determine the level of scrutiny that applies to the regulation of protected speech at issue." *Kokinda,* 497 U.S. at 725, 110 S.Ct. at 3118. As explained above, in *Hedges III* we assumed that the public forum analysis set forth in such cases as *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), and *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), applied to the school setting. Employing this analysis, we determined that Wauconda Junior High School was a closed forum and consequently that the regulation on student speech need only be reasonable to pass muster.

■ In their motion for reconsideration, the Plaintiffs ask us to reconsider not only our holding that Wauconda Junior High School is a closed forum but also that the forum analysis applies in the school setting. (Pls.' Mem.Supp. at 7–12.) After reviewing the relevant cases, we can only conclude that the protections afforded students' First Amendment rights in the schoolhouse are a maze of subtle and somewhat conflicting distinctions. For this reason, we have decided to explore in greater

---

**10.** The First Amendment specifies in pertinent part, "Congress shall make no law … abridging the freedom of speech."

depth the propriety of employing the forum analysis.

### 1. *The Tinker Test*

Although it was by no means the first Supreme Court opinion to address the First Amendment's extension to the schoolhouse, *Tinker v. Des Moines Independent School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), is perhaps the most venerable. *Tinker* announced unequivocally that students and teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 506, 89 S.Ct. at 736. The Court explained that personal intercommunication among the students is "an important part of the educational process," which may not be curbed by school officials merely out of a desire to avoid conflict or the expression of unpopular ideas. *Id.* at 512, 89 S.Ct. at 739; *see also id.* at 511, 89 S.Ct. at 739. It concluded that "In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views." *Id.* at 511, 89 S.Ct. at 739.

■ The Court also set out constitutionally valid reasons that would permit regulation by school authorities: "[C]onduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Id.* at 513, 89 S.Ct. at 740. The *Tinker* Court made it clear that in order to justify a restriction based on "material disruption" something more than an "undifferentiated fear or apprehension of disturbance" would

be required; evidence by way of a finding or showing would be necessary. *Id.* at 508–09, 89 S.Ct. at 737. If a test can be distilled from *Tinker* it would be as follows: a school speech regulation passes constitutional muster only where the speech in question would (1) materially disrupt classwork; (2) cause substantial disorder; or (3) invade the rights of others. We shall refer to this test by the shorthand "*Tinker* Test." [11]

Plaintiffs urge that we apply this test to the regulation at issue in this case. Although a few courts still employ the *Tinker* Test,[12] we cannot ignore that since the Supreme Court decided *Tinker* in 1969, it has developed an additional construct for evaluating the regulation of speech in public places, namely the public forum analysis.[13]

### 2. *The Public Forum Analysis*

The public forum analysis begins with the proposition that "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). In *Perry*, the Supreme Court divided government property into three different types of forums for the purpose of First Amendment free speech analysis—the traditional public forum, the limited public forum, and the nonpublic (or closed) forum—with the type of forum determining the level of scrutiny to be applied in examining the restriction on speech. The Seventh Circuit described the rationale behind this categorization as an attempt to "strike a balance between the interest in free speech and the counter-

---

**11.** Since *Tinker* was decided in 1969 the Court has amplified one of *Tinker*'s implicit principles, namely that the constitutional rights of students in public schools are not automatically co-extensive with the rights of adults in other settings. *See Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 682, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986).

**12.** *See, e.g., Rivera v. East Otero Sch. Dist.*, 721 F.Supp. 1189 (D.Colo.1989).

**13.** Despite questions regarding the current applicability of the *Tinker* Test, there is no question that *Tinker*'s primary holding—that students do not shed their First Amendment rights at the schoolhouse door—is still good law. *See, e.g., Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266, 108 S.Ct. 562, 567, 98 L.Ed.2d 592 (1988) (relying on and quoting *Tinker* holding).

vailing interest in the efficient operation of government." *May v. Evansville–Vanderburgh Sch. Corp.,* 787 F.2d 1105, 1114 (7th Cir.1986).

 Traditional public forums are "places which by long tradition or by government fiat have been devoted to assembly and debate." *Perry,* 460 U.S. at 45, 103 S.Ct. at 954. Restrictions on speech in these forums are analyzed with strict scrutiny: "For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Id.* Limited public forums are "property which the State has opened for use by the public as a place for expressive activity." *Id.* This type of forum may be created for a limited purpose (i.e., for use by a specific group or for the discussion of certain subjects). *See Widmar v. Vincent,* 454 U.S. 263, 267, 102 S.Ct. 269, 273, 70 L.Ed.2d 440 (1981); *Madison Joint Sch. Dist. v. Wisconsin Pub. Employment Relations Comm'n,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976). Restrictions on speech in a limited public forum are also reviewed with strict scrutiny: "Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum." *Perry,* 460 U.S. at 46, 103 S.Ct. at 955.

 Regulation in nonpublic forums, also known as closed forums, is subject to a less intense level of scrutiny. A closed forum is one that "is not by tradition or designation a forum for public communication." *Id.* "In addition to time, place, and manner regulations, the State may reserve the [closed] forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.*

### 3. Schools And The Forum Analysis: Supreme Court Decisions

The Supreme Court has extended the forum analysis into the school setting. In *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), the Court considered whether a state university that made its facilities generally available for the activities of registered student groups could close its facilities to a registered student group desiring to use them for religious worship and religious discussion. The Court analyzed the nature of the forum and concluded that by creating a forum generally open for use by student groups, the university had created a limited public forum and could not impose a content-based restriction to exclude such a group without a compelling interest. *Id.* at 267, 102 S.Ct. at 273.

Two years later in *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), the Court considered whether a collective bargaining agreement's specification that only a certain teachers' union be permitted access to the school's internal mail system violated, *inter alia,* the First Amendment. In reaching its conclusion that it did not, the Court employed (and expounded at length upon) the forum analysis. More recently in *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), the Court applied the forum analysis when it scrutinized a school's censorship of certain materials submitted by students for inclusion in the school newspaper. The Court ultimately concluded that the newspaper was a closed forum in light of its peculiar characteristic as a school-sponsored publication. *Id.* at 267–70, 108 S.Ct. at 568–69.

### 4. Plaintiffs' Position

The Plaintiffs acknowledge that the Supreme Court has applied the forum analysis in school settings; however, they advance two reasons why this analysis ought not be applied to their situation. First, they submit that the "touchstone" of the forum analysis is a request for access to government property that would otherwise not be accessible to the applicant. (Pls.' Mem.Supp. at 7.) They argue that their case is distinguishable from this scenario

because Plaintiffs attend the school under legal compulsion and, therefore, already have access to the property involved. Their second grounds for distinction is that the students here are not attempting to seek access to established school programs as a platform for advancing their religious views. (*Id.*) We will analyze each basis for distinction in turn.

### 5. *Access Argument*

The distinction that Plaintiffs would have us draw is between "outsiders" (those who do not enjoy access to the property in question) and "insiders" (those who do). They contend that the forum analysis only applies in cases where outsiders seek access to governmental property, not to insiders who already are present on the property. After scrutinizing the Supreme Court forum cases, we conclude that Plaintiffs' access argument is misguided.

The fatal flaw in Plaintiffs' contention is that they assume that rightful presence on governmental property equals universal access for speech purposes. Their essential premise is that once a student has access to a school's premises by virtue of being a student, she has access to it for all purposes—to attend classes, to exercise speech rights, and to play in the playground. The Supreme Court, however, has indicated that rightful presence on a property does not automatically confer access to that property for speech purposes. For example, in *United States v. Kokinda*, 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990), the Court held that patrons of a post office, who obviously already had access to that office, could be prohibited from soliciting and distributing materials on post office property. In reaching this conclusion, the Court explained that access alone is not enough to guarantee an unfettered right to speak:

> Nor is the right of access under consideration in this case the quintessential public sidewalk which we addressed in *Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (residential sidewalk). The postal sidewalk was constructed solely to assist postal patrons to negotiate the space between the parking lot and the front door of the post office, not to facilitate the daily commerce and life of the neighborhood or city.

*Id.* 497 U.S. at 727–28, 110 S.Ct. at 3120. Thus, in *Kokinda* we see that patrons who had "access" to the sidewalk for one purpose, did not automatically have "access" to it for another. *Kokinda* illustrates that the Court applies the forum analysis where persons who have access to the property for a nonspeech-related purpose challenge a prohibition on their using that property for public speech.

*Hazelwood*, dealing as it does with the speech rights of insiders, is also instructive. As noted above, *Hazelwood* concerned the censorship of student-written materials that had been submitted to the school newspaper in connection with a journalism course. In that case, the Court applied the forum analysis despite the fact that the students had "access" to the school—by virtue of compulsory attendance laws—and to the newspaper—by virtue of their course on journalism and involvement in the publication. As will be discussed in greater detail below, Plaintiffs seek to distinguish their case from *Hazelwood* on another basis, namely that *Hazelwood* involved a school-sponsored forum. However, it is undeniable that *Hazelwood* did not make the insider/outsider distinction that the Plaintiffs would have us follow.

Moreover, we believe that the generalized language of *Hazelwood* suggests that the Court does intend that the forum analysis apply in cases where student speech is regulated in the school. For example, the Court stated, "If the [school] facilities have ... been reserved for other intended purposes 'communicative or otherwise,' then no public forum has been created, and school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community." 484 U.S. at 267, 108 S.Ct. at 568. That excerpt's reference to students, teachers, and members of the school community suggests that the forum analysis applies even when these insiders challenge school restrictions on their speech, not just where

outsiders want access to school facilities for speech purposes. While it is true that one federal appellate court apparently embraced Plaintiffs' insider/outsider access interpretation, *Texas State Teachers Association v. Garland Independent School District*, 777 F.2d 1046, 1053 (5th Cir.1985), *aff'd mem.*, 479 U.S. 801, 107 S.Ct. 41, 93 L.Ed.2d 4 (1986), this case predates *Hazelwood*. After *Hazelwood*, we believe that the insider/outsider distinction is no longer viable. *See DeNooyer v. Livonia Pub. Sch.*, 799 F.Supp. 744 (E.D.Mich.1992) (rejecting the insider/outsider access argument).

We also note that even prior to *Hazelwood* the Seventh Circuit employed the forum analysis, albeit reluctantly, to the school setting [14] where the restriction in question applied to those already permitted access to the school. The case, *May v. Evansville–Vanderburgh School Corp.*, 787 F.2d 1105 (7th Cir.1986), is not unequivocal for while it applies the public forum analysis, it notes that "there is a question whether the public forum doctrine is intended to apply to purely internal gatherings." *Id.* at 1113. Still *May* did apply the forum test and, therefore, controls us here.

The plaintiff in *May* was a teacher at Harper Elementary School, a public school for students in kindergarten through the fifth-grade. Ms. May was an evangelical Christian who began meeting in 1981 with two other teachers of like faith every Tuesday morning at school to pray, sing hymns, and discuss the Bible before classes began. In 1983 the principal learned of the meetings and immediately banned them. Ms. May filed suit alleging that the ban on the meetings violated her constitutional right to freedom of speech.

Ms. May, who obviously already had access to the school, argued, *inter alia*, that the administrators had opened the school in such a way as to qualify it as a public forum and as a consequence could not now discriminate against religious speech. The court vacillated on whether to apply the forum analysis, but ultimately did so, finding that the school was a closed forum and that the ban on meetings was reasonable. Its hesitation at applying the forum analysis is clear from the first:

> The reference in the *Widmar* opinion to public forum may suggest that it is important whether the Harper School is a public forum, but we are not at all sure of this. Not only is there a question whether the public forum doctrine is intended to apply to purely internal gatherings (for Mrs. May apparently does not wish to invite anyone to join her prayer group who is not an employee of the school); Mrs. May's specific contention—that the school discriminates arbitrarily against one type of speech, religious speech—would if true establish an abridgement of free speech however one classifies the Harper School along the range of public-private forum.

*Id.* at 1113. Despite this misgiving, the court proceeded to apply the forum analysis to the Harper School and found that the school is a closed forum even though outside lecturers were often featured at the school and the school had numerous clubs. Even after applying the analysis, the court commented, "we might ... question the relevance of any sort of 'forum' analysis to a case where government employees are seeking to use government premises for the communication of ideas and opinions to each other only, so that the public at large is not involved." *Id.* at 1114.

The court apparently did not believe it was really necessary to determine whether the forum analysis applied because it as-

14. With respect to regulation of speech in public, non-school properties, it is clear that the Seventh Circuit has embraced the forum analysis. *Doe v. Small*, 964 F.2d 611 (7th Cir.1992); *Stokes v. Madison*, 930 F.2d 1163, 1170 (7th Cir.1991); *Doe v. Crestwood*, 917 F.2d 1476, 1478 (7th Cir.1990); *Lubavitch Chabad House v. Chicago*, 917 F.2d 341, 347 (7th Cir.1990). Its treatment of regulation of speech in the schools is less clear. Immediately after *Tinker*, the Seventh Circuit employed the *Tinker* test. *See, e.g., Fujishima v. Board of Educ.*, 460 F.2d 1355, 1357 (7th Cir.1972); *Scoville v. Board of Educ.*, 425 F.2d 10, 13 (7th Cir.1970), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). Most recently, they half-heartedly applied the forum analysis to the regulation of teacher speech in *May v. Evansville–Vanderburgh School Corp.*, 787 F.2d 1105 (7th Cir.1986), the case discussed more fully in this section.

sumed that "Mrs. May has a cause of action if the defendants, while not obligated to allow teachers or anyone else to use school premises for meetings, in fact allowed the premises to be used for any meetings by teachers except prayer meetings." *Id.* The court added, "This would be a restriction discriminating against a particular point of view and would therefore flunk the test we quoted from *Cornelius* [which stated that viewpoint discrimination was not permissible even in nonpublic forums], provided that the defendants have no defense based on the establishment clause, and we shall assume they do not." *Id.* The court then went on to consider whether the Harper School had discriminated against religious meetings. It concluded that it had not, for the school had only been used for meetings related to school business. *Id.* at 1116–17.

We believe that despite its dicta to the contrary, *May* dictates that we apply the forum analysis to the regulation of speech of school insiders, such as teachers and students.[15] After all is said and done, this is exactly what the Seventh Circuit did in that case. Moreover, as we interpret *Hazelwood*, that case ought to erase any hesitation against applying the forum analysis to insiders. We think that our decision to employ the forum analysis is fortified by the general trend in federal appellate courts to extend the forum analysis into the secondary and lower school settings.[16] *See, e.g., Grace Bible Fellowship v. Maine Sch. Admin. Dist.*, 941 F.2d 45, 47 (1st Cir.1991) (launching as a matter of course into forum analysis); *Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1370 (3rd Cir.1990) (same); *Bell v. Little Axe Indep. Sch. Dist.*, 766 F.2d 1391, 1401 (10th Cir. 1985) (same); *Bender v. Williamsport Area Sch. Dist.*, 741 F.2d 538, 545 (3rd Cir.1984) (same), *vacated on other grounds*, 475 U.S. 534, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986); *Thompson v. Waynesboro Area Sch. Dist.*, 673 F.Supp. 1379, 1384 (M.D.Pa.1987) (same).

**15.** The *May* court did consider *Tinker,* but explained rather obliquely that the opinion "does not close the gap." *Id.* at 1112. The court focused on the fact that *Tinker* involved student expression and that these students "were in the school under the compulsion of the school law and retained their rights of free speech to the extent compatible with the needs of school discipline—as do other involuntary guests of the government, such as prison inmates." *Id.* (citation omitted). Teachers by contrast, it suggested, enjoy "limited First Amendment rights but not by virtue of being teachers, and those rights do not include the use of school premises for unauthorized meetings unrelated to teaching." *Id.* From this limited discussion of *Tinker,* it is difficult to glean whether the Seventh Circuit still would apply the *Tinker* Test to assess challenges to restrictions on student speech. However, given the comparison of students to prison inmates, one might well wonder if the rigorous test would still find favor with the court.

**16.** We acknowledge, of course, that without explicit language by the Supreme Court stating that the *Tinker* Test is dead, we cannot proclaim it so. Moreover, we also acknowledge that despite the general trend toward applying the forum analysis in schools, this shift has not been without controversy. *See Slotterback v. Interboro Sch. Dist.,* 766 F.Supp. 280, 288 (E.D.Pa. 1991) ("Courts and commentators are divided ... over whether judicial 'forum analysis' should apply to regulations limiting students' personal, protected speech that occurs on school property during school hours.") In fact, some lower courts have rejected the forum analysis in school cases. *Rivera,* 721 F.Supp. at 1192 (criticizing the forum analysis as "fundamentally flawed because it ignores the holding in [*Tinker* ] and it misreads [*Hazelwood* ] and [*Bethel* ]," but applying it as an alternative just in case). Others have sought to reconcile the two. *Nelson v. Moline Sch. Dist.,* 725 F.Supp. 965, 973 (C.D.Ill.1989) (finding that *Tinker* is not in conflict with subsequent forum opinions because *Tinker* Test mirrors strict scrutiny required for public and limited public forums); *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 777 F.2d 1046, 1053 (5th Cir.1985) (the forum analysis applies to "outsiders" who wish to use school facilities, whereas the *Tinker* Test applies to "insiders" (e.g., students and teachers)), *aff'd mem.,* 479 U.S. 801, 107 S.Ct. 41, 93 L.Ed.2d 4 (1986).

Yet, as we state here, by far the majority have applied the forum analysis without even addressing the *Tinker* Test. *See, e.g., Grace Bible Fellowship v. Maine Sch. Admin. Dist.,* 941 F.2d 45, 47 (1st Cir.1991) (launching as a matter of course into forum analysis); *Gregoire v. Centennial Sch. Dist.,* 907 F.2d 1366, 1370 (3rd Cir. 1990) (same); *Bell v. Little Axe Indep. Sch. Dist.,* 766 F.2d 1391, 1401 (10th Cir.1985) (same); *Bender v. Williamsport Area Sch. Dist.,* 741 F.2d 538, 545 (3rd Cir.1984) (same), *vacated on other grounds,* 475 U.S. 534, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986); *Thompson v. Waynesboro Area Sch. Dist.,* 673 F.Supp. 1379, 1384 (M.D.Pa.1987) (same).

### 6. School–Sponsored Platform Argument

Plaintiffs' second explanation for why the forum analysis ought not be applied to their situation is that the distribution of materials on school grounds in the manner prescribed by the New Policy does not make use of a school-sponsored platform. Because the distribution is not school sponsored, the argument goes, it is not subject to the forum test. We think that this argument turns the analysis in *Hazelwood* on its head.

In *Hazelwood*, the Supreme Court did not apply the forum analysis to the school newspaper because it determined that it was a school-sponsored publication. Instead, its application of that analysis had nothing whatsoever to do with the nature of the publication. The opinion's very language suggests that the Court would have applied the forum test to a restriction on speech in any school facility:

> The public schools do not possess all of the attributes of streets, parks, and other traditional public forums that "time out of mind have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Hence, *school facilities* may be deemed to be public forums only if school authorities have "by policy or practice" opened those facilities "for indiscriminate use by the general public," or by some segment of the public, such as student organizations. If the *facilities* have instead been reserved for other intended purposes, "communicative or otherwise," then no public forum has been created....

484 U.S. at 267, 108 S.Ct. at 568 (emphasis added) (citations omitted). As this excerpt indicates, the type of school "facility"—whether it be a school newspaper or athletic field—has nothing to do with determining the test to be employed.

This conclusion does not ignore that *Hazelwood* places great emphasis on the fact that the publication was in fact school sponsored. To the contrary, we acknowledge that emphasis; however, we read *Hazelwood* as focusing on the school sponsorship (1) to determine the nature of the forum involved and (2) to explain why censorship was permissible in this closed forum. Thus, the emphasis on school sponsorship came into play after the Court determined that the forum test was appropriate.

Now that we have determined that the forum analysis applies, we must reevaluate whether Wauconda Junior High School qualifies as a closed forum.

### B. What Type of Forum Is Involved?

■ At the time of the preliminary injunction hearing, we made the preliminary determination that the school, through its New Policy, had created a limited public forum. Although we declined to reassess our preliminary determination when considering Defendants' Motion to Dismiss, we did so after hearing additional testimony at the bench trial.[17] In *Hedges III* we decided that the administrators of Wauconda Junior High School, in their policy and practice, did not open the school as a public forum.

■ We will start our analysis here as we did in *Hedges III* with the observation from *Hazelwood*, quoted in part above, that

> public schools do not possess all of the attributes of streets, parks, and other

---

**17.** Apparently our prior understanding—that the parties agreed during the preliminary injunction hearing that the school was a limited public forum (*see Hedges I*, Mem.Op. at 15 n. 5)—was in error. Before we issued *Hedges III*, we reviewed the transcript of that hearing and realized that defense counsel made no such stipulation. Instead, at that hearing Defendants' counsel merely stated that "at best" the evidence showed that school officials created a limited or designated public forum under the New Policy. By analyzing the facts in terms of a limited public forum, however, defense counsel apparently did not intend to concede that the school was a limited public forum because, later in his arguments, he refers to the reasonableness of the rule (Tr. of Prelim. Hearing at 207)—reasonableness being the test for regulation of speech in a closed forum. Indeed, in every brief they have filed, Defendants have maintained that the school is a closed forum. (*See, e.g.,* Defs.' Mem. Opp'n Pl.'s T.R.O. Mot. at 17; Defs.' Mem.Supp. Mot.Dis. at 5–6.)

traditional public forums that "time out of mind have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). *Cf. Widmar v. Vincent*, 454 U.S. 263, 267–268, n. 5, 102 S.Ct. 269, 273, n. 5, 70 L.Ed.2d 440 (1981). Hence, *school facilities may be deemed to be public forums only if school authorities have "by policy or by practice" opened those facilities "for indiscriminate use by the general public,"* Perry Educ. Ass'n v. Perry Educators' Ass'n, [460 U.S. 37, 47, 103 S.Ct. 948, 956, 74 L.Ed.2d 794 (1983)], *or by some segment of the public, such as student organizations. Id.* at 46, n. 7 [103 S.Ct. at 955, n. 7] (citing *Widmar v. Vincent*). *If the facilities have instead been reserved for other intended purposes, "communicative or otherwise," then no public forum has been created,* and school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community.

484 U.S. at 267, 108 S.Ct. at 568 (emphasis added). As we noted in our earlier opinion, *Hazelwood* dictates that our focus be on the affirmative activities of the Wauconda Junior High School administrators and whether these activities opened the forum or merely reserved it for other intended purposes ("communicative or otherwise").

In our case it is clear that the School District not only contemplated that expressive conduct by students would occur, but sought to encourage an exchange of ideas in the school-body outside as well as inside the classroom.[18] However, the occurrence of expressive activity alone is not sufficient to qualify a particular forum "public" or "limited public": "That such [expressive] activity occurs in the context of the forum created does not imply that the forum thereby becomes a public forum for First Amendment purposes." *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 805, 105 S.Ct. 3439, 3450, 87 L.Ed.2d 567 (1985). As the Seventh Circuit stated in *May*, "A non-public forum is not necessarily a place of silence; it may still be a forum, as the term implies; it just is not a place generally open to the public." 787 F.2d at 1113.

In *Hedges III* we made numerous findings from the evidence that had been presented at the bench trial and in the briefs. These findings can be summarized as follows:

1) Wauconda Junior High School's primary purpose is clearly the education of seventh through ninth graders;

2) the School District's New Policy governing the distribution of materials by the students was designed to further the school's educational mission;

3) the district wanted to encourage student expression of their own ideas to enhance the students' educational experience while at school[19];

---

**18.** The New Policy instituted by the School District states: "It is beneficial to the educational mission of the school for junior high school students to express their own views concerning a wide variety of topics and issues and share them with other students in the school, even when these views may be unpopular or controversial." (New Pol'y Section A.)

**19.** In a letter addressed to Mr. and Mrs. Hedges, the School District explained:

Because the process of educating our students is not confined to the classroom but occurs throughout the time the student is at school, Wauconda Junior High School has had a tradition that students of the school may express their views concerning a wide variety of topics—even when their views may be unpopular or controversial. These topics may range from the quality of the food in the school lunchroom to issues of national (*e.g.,* civil rights) or international (*e.g.,* the Mid-East crisis) importance. We believe that the fostering of student discussion and debate of issues which touch on the students' own lives at school or which relate to the curriculum of the school is consistent with and beneficial to the educational mission of the school. Such student expression serves as natural extension of the educational lessons learned within the classroom by reinforcing the specific subject matter taught, by requiring the use of critical thinking skills, by promoting tolerance for a diversity and, sometimes, unpopular views, and by teaching the socially appropriate form of civil discourse and expression. The current policy continues this tradition.
(Unsigned Letter to Mr. and Mrs. Kenneth Hedges of 1/7/90 [sic], at 1–2.)

4) the school is not first and foremost a forum for debate; instead, it is an educational institution that permits some limited discourse outside the classroom as part of its educational mission;

5) neither the School District nor the individual administrators intended to open the school to expressive activity beyond what was necessary to serve and enhance the school's educational purpose.

The question before us now is whether the additional evidence produced by the Plaintiffs sufficiently changes our overall understanding of the nature of the forum at Wauconda Junior High School to warrant our finding it a limited public forum. This additional evidence may be summarized as follows:

1) prior to the promulgation of the Original Policy, distribution of *Issues and Answers* occurred on the campus of Wauconda Junior High School with the knowledge and permission of the school's administrators (Tr. Sabourn Dep. at 95–98); (Tr. Barnes Dep. at 80); (Tr. Barnett Dep. at 10); (Tr. Baade Dep. at 7–10);

2) prior to the promulgation of the Original Policy, the school required that students wishing to distribute *Issues and Answers* on campus request permission to do so and provide a copy of the paper to the principal one day prior to distribution, not be disruptive, and clean up any mess that resulted from distribution (Tr. Barnett Dep. at 10); (Tr. Baade Dep. at 10);

3) under previous principals the junior high school possessed a community bulletin board that was used for posting announcements and that was available to promote nonschool-sponsored activities on a permission-required basis (Tr. Baade Dep. at 13–14);

4) the school does permit some outside organizations access to their facilities during nonschool hours; however, the park district, which is the major user, only uses the facility once a year (Tr. Golden Dep. at 12–17);

5) the school hosts assemblies to which it invites various outside speakers to come and speak to the students (Tr. Golden Dep. at 50–52);

6) the school has an active club program featuring nine groups all of which are school sponsored and have some relationship to the curriculum, although none are mandatory or provide course credit (Tr. Golden Dep. at 20–34).

■ The first, second, and third items of new evidence—concerning the materials distribution and bulletin board policies prior to the Original Policy and New Policy—have little bearing on this case, for where school officials open an otherwise closed forum as a limited public forum, they are not required to maintain it as a limited public forum indefinitely. They may, if they choose, return the forum to its closed state. *Perry*, 460 U.S. at 46, 103 S.Ct. at 955 (state not required to retain indefinitely the open character of a facility that it has opened to the public). Thus, even if the school was a limited public forum in the past, this fact has no bearing on the nature of the forum today. Although it may not shed light on the school's current classification, this new information does indicate that, at least in the past, distribution of *Issues and Answers* has not materially disrupted coursework at the school.

As for item five—the outside speakers—we know from *May* that "[a] college classroom (and *a fortiori* an elementary school classroom) does not become a public forum because a guest lecturer from the outside is invited to talk to the class." 787 F.2d at 1113. If, as *May* points out, "[a] military base does not become a public forum merely because civilian speakers are occasionally invited to the base," it would be illogical to conclude that a junior high school becomes a public forum because outside speakers are invited to lecture. *Id.*

The infrequent use of school facilities by outside organizations—item four—also does not change our previous finding that the school is a closed forum. In *May* the school was used as a polling place, for meetings by the Boy Scouts and Girl Scouts (both outside organizations), and once even as a place of worship by a church whose building had burned down.

**462**

Nevertheless, the Seventh Circuit concluded that school was a closed forum:

> Harper Elementary School is not a public forum. The public is not invited to use its facilities as a soapbox. The public is not invited in, period. . . .

*Id.* at 1114. In our case one annual use by the park district and sporadic use by other entities is not sufficient to qualify the school a limited public forum. Just as in *May,* the use by outside groups is exceptional, and all other use is by school-related groups.

■ Finally, we come to the issue of school clubs, item six in our list of new evidence. In *Hedges III* we contrasted the situation at Wauconda Junior High School with that involved in *Thompson v. Waynesboro Area School District,* 673 F.Supp. 1379 (M.D.Pa.1987), where student groups unrelated to the curriculum made use of school facilities almost as a matter of course and where this fact convinced the *Thompson* court to find the school a limited public forum. We suggested that because the student clubs at Wauconda Junior High School were all curriculum related and that school administrators did not give permission to these clubs or any other people or organizations to use the school facility as a matter of course, the school was a closed forum. This comparison suggested that the crucial question with respect to clubs is whether they are (1) curriculum related and (2) permitted as a matter of course.

We now believe that we were in error to so decide because this two-part test ignores the controlling Seventh Circuit determination in *May* that as long as a school group is "school-related," its presence on campus does not turn the school into an open forum. In *May* the court stated,

> The school has been host to meetings of the P.T.A. (which of course is school related), the boy scouts, the girl scouts, "fine arts groups" not further defined, and "booster" clubs, which raise money for school athletic teams and thus are

also school-related. . . . No policy forbidding nonreligious groups to use school property for meetings has been formulated, but on the other hand no such group (unless school-related) has ever been allowed to hold meetings at the school. 787 F.2d at 1115. The court later repeated that the school had "never been used for meetings unrelated to the business of the school." *Id.* at 1116. This fact alone apparently was enough to convince the court that the school was a closed forum. *Id.* at 1117. Wauconda's nine student groups[20] are all school-related.

Even if the school-related standard articulated in *May* is erroneous, we believe that the nine clubs cannot be meaningfully distinguished from the newspaper at issue in *Hazelwood,* which the Court found to be a closed forum. Although the *Hazelwood* newspaper is unlike the Wauconda clubs insofar as it was tied directly to a particular class, it is similar to them in that it was school sponsored and controlled. In the final analysis, we find that the fact that a group or activity provides course credit is less important than the fact that it is school sponsored and controlled. All of the clubs at Wauconda Junior High School are school sponsored and controlled. Hence, we find that their presence at the school does not transform it into a limited public forum.

## C. Scrutinizing the Challenged Regulations

After concluding that the Wauconda Junior High School is a closed forum, we now turn to the specific portions of the New Policy that have been challenged by the Plaintiffs. As noted above, the sections at issue are Section B–2 (time, place, and manner restrictions), Section B–7 (prohibitions on material primarily prepared by nonstudents or concerning the activities of a non-school-sponsored organization), and Section B–6(e) (prohibition on religious material that students could reasonably believe are school sponsored or endorsed).[21] Although

---

**20.** The school's nine clubs are the Adopted Grandparents Club, Spirit Group, Newspaper, In Touch, Student Council, Drama, Conservation Club, Yearbook, and Junior Great Books.

**21.** Pursuant to these challenged sections, the school refused to permit the Plaintiffs to distribute the following materials: *Issues and Answers* (banned because it is primarily prepared by

we determined in *Hedges III* that these restrictions were reasonable and Plaintiffs have not challenged our determination, we decided after further reflection to alter our determination in the following respects: first, we conclude now that the New Policy's time, place, and manner restrictions cannot stand as written; second, we find that on reconsideration the prohibition on materials not primarily prepared by students is unreasonable. In order to explain our decision to revise our earlier determinations, we explain in brief our analysis of each of the challenged sections.

### 1. Section B–6(e)

■ Section B–6 states, "Students shall not distribute written material ... (e) which expresses religious beliefs or points of view that students would reasonably believe to be sponsored, endorsed or given official imprimatur by the school...." As we noted at the outset, the subsections listed under the heading "(e)" are for illustrative purposes only and are all subject to the condition regarding confusion over school sponsorship. We continue to believe that this restriction is reasonable for the reasons set forth in *Hedges III.*

As we stated in that earlier opinion, a school has a compelling interest in complying with its constitutional obligations, one of which is not offending the First Amendment's Establishment Clause.[22] *See Widmar,* 454 U.S. at 271, 102 S.Ct. at 275. The Establishment Clause is clearly violated where government speech endorses religion. *Board of Educ. ·of Westside Commun. Sch. v. Mergens,* 496 U.S. 226, 250, 110 S.Ct. 2356, 2372, 110 L.Ed.2d 191 (1990). As the Court stated in *County of Allegheny v. American Civil Liberties Union,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989),

In the course of adjudicating specific cases, this Court has come to understand the Establishment Clause to mean that government may not promote or affiliate itself with any religious doctrine or organization, may not discriminate among persons on the basis of their religious beliefs and practices, may not delegate a governmental power to a religious institution, and may not involve itself too deeply in such an institution's affairs.

*Id.* at 3099. Section B–6(e) is the School District's attempt to disassociate itself from the religious materials rightfully distributed by students on campus. We believe that the purpose behind this section is entirely reasonable and that the section fulfills this purpose in a reasonable manner. The only problem that this Court has with the section is its operation in conjunction with Section B–2's time, place, and manner restrictions.

### 2. Time, Place, and Manner Restrictions

■ Section B–2 of the New Policy reads:

Material shall be distributed between 7:15 a.m. and 7:45 a.m. and 3:15 p.m. and 3:45 p.m. from a table to be set up by the school for such purposes. The table shall be located at or near the main entrance of the building. No more than two students distributing the same material shall be seated at the table.

In *Hedges III* we determined that this section and the other time, place, and manner restrictions (Sections B–1 and B–3 through B–5) were reasonable because that school had a justifiable interest in ensuring the orderly distribution of materials. In our

---

nonstudents and, alternatively, because it is religious material that could be viewed as school endorsed) and the Operation Dessert Shield flyer (banned because it pertains to a nonschool sponsored event).

**22.** The First Amendment states in pertinent part, "Congress shall make no law respecting an establishment of religion." This clause applies to the states through the Fourteenth Amendment. *Board of Educ. of Westside Commun.*

*Sch. v. Mergens,* 496 U.S. 226, 247, 110 S.Ct. 2356, 2370, 110 L.Ed.2d 191 (1990).

In *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Court held that in order not to offend the Establishment Clause a statute must (1) have a secular legislative purpose, (2) have as its principal or primary effect one that neither advances nor inhibits religion, and (3) not foster and excessive entanglement with religion. *Id.* at 612–13, 91 S.Ct. at 2111.

discussion of the restrictions, we commented,

> we are troubled by the possibility that these restrictions—through the manner of distribution that they require—could raise Establishment Clause problems with religious materials that by their format alone do not create any confusion regarding school sponsorship or endorsement. As both experts testified, the time, place, and manner of the distribution of materials is an ingredient in determining whether a student might believe that the school sponsored, endorsed, or lent its imprimatur to them. We believe that it is unreasonable for the school to design time, place, and manner restrictions that themselves create the Establishment Clause objection to religious materials that otherwise, e.g., through their format, would not give rise to Establishment Clause concerns. However, we are not presented with such a case, and although it causes us grave concern, we do not need to strike down the New Policy on this ground.

*Hedges III*, Mem.Op. at 27. As this passage indicates, we were bothered then by the nagging possibility that the time, place, and manner restrictions in Section B–2 actually create sponsorship problems where they might not otherwise exist.

After ruminating on this problem for over a year, we conclude that it is presented in our case. On further reflection, we believe that *Issues and Answers* by itself does not appear school sponsored and that even junior high students probably would not think that it was school sponsored if it were passed out to them by a student standing alone on the school stairs before classes begin. We find that in our case the physical characteristics of *Issues and Answers* plus the method of its dissemination, which was prescribed in Section B–2, are what combine to create the impression in young students that the publication is school endorsed.

The problem as we see it is that the New Policy requires that the distribution of materials be conducted within the school building, in particular in a room that is moni-

tored by school personnel where students are required to assemble before classes begin. Moreover, the policy requires that the distributing student sit at a table near the door. The table adds a sense of authority to the distribution that it otherwise might not have. In addition, the presence of teachers in the room and the fact that students are compelled to be present in the room add up to a situation that provides the stamp of school authority where it otherwise might not exist. Thus, we now conclude that *Issues and Answers* was prohibited under Section B–6(e) as a result of the operation of the time, place, and manner restrictions. This result we believe is impermissible. Consequently, the New Policy's time, place, and manner restrictions are invalid.

### 3. *Section B–7*

For the reasons articulated in *Hedges III*, we continue to find that Section B–7's prohibition on the distribution of materials that concern "the activities, or meetings of a non-school sponsored organization" is reasonable. As we stated there,

> First, the school is first and foremost concerned with its own activities and may reasonably wish to limit comment to the substance of those activities. Second, as Dr. Dick testified, the school is acting *in loco parentis* and as such may be concerned that its campus not be used to discuss the activities of outside organizations, the reputation and legitimacy for which it cannot vouch.

*Hedges III*, Mem.Op. at 24. We continue to believe that this justification is sufficient to support that portion of Section B–7.

We have changed our mind about Section B–7's prohibition on the distribution of material that is not primarily prepared by a student. Section B–7 states in pertinent part, "Because non-school sponsored organizations and non-students are prohibited from distributing material in schools or on school grounds, students are also prohibited from distributing written material which is primarily prepared by non-students...." Upon further reflection, we think that it is unreasonable for the School

District to conclude that its educational mission will be best served by excluding nonstudent prepared materials. While in school, students read materials prepared by such famous nonstudents as Homer, Shakespeare, and (if they are lucky) Lewis Carroll. They also prepare some materials themselves. Who does not remember burning the midnight oil to complete an essay due the next day? It is clear, therefore, that teachers have long believed that students learn by both reading the preparations of others and preparing some materials themselves. After this further reflection, we conclude that it is unreasonable, contrary to the school's educational mission, and downright arbitrary to prohibit students from distributing material that is prepared by others but that the distributor wishes to adopt as his or her own. Thus, we conclude that Section B–7's prohibition on nonstudent-prepared materials must be struck from the New Policy.[23]

### Conclusion

As described in detail above, we amend our judgment as follows:

(1) the New Policy's requirement that only student-prepared material be distributed is unreasonable and consequently must be deleted;

(2) the New Policy's time, place, and manner restrictions are invalid because these restrictions to a significant degree cause the appearance of school sponsorship of religious materials and thus are unreasonable;

(3) the Plaintiffs are awarded ten dollars in damages.

We hereby vacate the final judgment entered on October 21, 1991, and enter a final and appealable judgment effective today.

---

**23.** We note here, as we have before, that we are not presented with a case in which an outside organization is seeking access to the school and manipulating students into being distributors for the materials that the organization could not itself distribute on campus. Thus, we find that Section B–7's stated purpose—to ensure that nonschool-sponsored organizations and nonstudents do not circumvent the rules—is not implicated here.