Megan Renee HEDGES, et al.,
Plaintiffs–Appellees,

v.

WAUCONDA COMMUNITY UNIT
SCHOOL DISTRICT NO. 118, et
al., Defendants–Appellants.

No. 92–3779.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 10, 1993.

Decided Nov. 23, 1993.

Charles E. Hervas (argued), James G. Sotos, Hervas, Sotos & Condon, Itasca, IL, for plaintiffs-appellees.

William W. Kurnik, Kurnik, Cipolla, Stephenson & Barasha, Stanley B. Eisenhammer (argued), Alice M. Ralph, Heather K.

**1296**

Brickman, Francine R. Fishel, Hodges, Loizzi, Eisenhammer, Rodick & Kohn, Arlington Heights, IL, for defendants-appellants.

Marc D. Stern, American Jewish Congress, New York City, for American Jewish Congress, amicus curiae.

David R. Day, Johnson, Smith, Densborn, Wright & Heath, Indianapolis, IN, for National School Boards Ass'n, amicus curiae.

Mary Ann L. Wymore, Greensfelder, Hemker & Gale, St. Louis, MO, S. Mark Goodman, Student Press Law Center, Washington, DC, for Student Press Law Center, amicus curiae.

Steven T. McFarland, Bradley P. Jacob, Center for Law & Religious Freedom, Annandale, VA, Thomas C. Berg, Birmingham, AL, for Christian Legal Soc., amicus curiae.

Before BAUER, EASTERBROOK, and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Megan Hedges belongs to the Wauconda Evangelical Free Church. On November 2, 1990, while in eighth grade, she distributed a church publication, *Issues and Answers*, outside her school, the Wauconda Junior High School, before the start of the school day. Principal Christine Golden retrieved the pamphlets from the pupils and told Megan not to distribute such literature again. At the time, the school district had a policy (the 1990 Policy) providing:

> Distribution of written material that is obscence [sic] or pornographic, pervasively indecent and vulgar, libelous, invades the privacy of others or will cause substantial disruption of the proper and orderly operation of the school or school activities shall be prohibited. At the elementary and junior high school, written material that is of a religious nature is also prohibited. Students distributing such material shall be subject to discipline by the school administrators and/or the Board of Education.

Megan and two other students filed this suit (by their parents as next friends) to protest the school district's common treatment of obscenity, libel, and religion.

The district court promptly declared the 1990 Policy unconstitutional, and the school district adopted a new policy (the 1991 Policy). The disputed portions of the 1991 Policy provide:

> B. When any student or students, who as an individual or a group, seek to distribute more than 10 copies of the same written material on one or more days in the school or on school grounds, they must comply with the following procedures:
>
> 1. At least 24 hours prior to any distribution of material, the student shall notify the principal of his/her intent to distribute.
>
> 2. Material shall be distributed between 7:15 a.m. and 7:45 a.m. and 3:15 p.m. and 3:45 p.m. from a table to be set up by the school for such purposes. The table shall be located at or near the main entrance of the building. No more than two students distributing the same material shall be seated at the table.
>
> .    .    .    .    .
>
> 6. Students shall not distribute written material:
>
> a. which will cause substantial disruption of the proper and orderly operation and discipline of the school or school activities;
>
> b. which violates the rights of others, including but not limited to material that is libelous, invades the privacy of others, infringes on a copyright;
>
> c. which is socially inappropriate or inappropriate due to the maturity level of the students, including but not limited to material that is obscene, pornographic, pervasively lewd and vulgar or contains indecent and vulgar language;
>
> d. which is primarily of a commercial nature including but not limited to all material that primarily seeks to advertise for sale products or services;
>
> e. which expresses religious beliefs or points of view that students would reasonably believe to be sponsored, endorsed or given official imprimatur by the school including but not limited to
>
> (1) religious objects of workship [sic], prayers, tracts, commentaries, Bibles,

scriptures, and religious literature of a particular religious faith or organization which promulgate the teaches [sic] of the faith or organization whether in its original form or recopied in whole or part by the students;

(2) any religious material which represents an effort to proselytize other students; and

(3) any religious material whose format would lead students to believe that the material is sponsored or endorsed by the school.

7. Because non-school sponsored organizations and non-students are prohibited from distributing material in schools or on school grounds, students are also prohibited from distributing written material which is primarily prepared by non-students or which concerns the activities, or meetings of a non-school sponsored organization.

Acting under this new policy, Principal Golden forbade Megan to hand out more than 10 copies of *Issues and Answers* or a flyer inviting fellow pupils to "Operation Dessert Shield," to be held at the Wauconda Evangelical Free Church, at which the students would send postcards to service men and women in the Persian Gulf. The flyer mentioned other activities such as volleyball, a movie, and ice cream, but had no religious content beyond the implication of its location. Principal Golden permitted Megan to distribute a "position paper" quoting the first amendment and a speech given by President Lincoln referring to God, and stating "I Believe in God, Won't You?"

Plaintiffs believe that the 1991 Policy violates the first amendment by treating religious literature less favorably than other speech, by requiring pupils to distribute permitted literature from a table, and by forbidding the distribution of "written material which is primarily prepared by non-students". After holding two bench trials (one on each policy), the district court concluded that each violates the plaintiffs' rights: the 1990 Policy by forbidding the distribution of all material with religious content, the 1991 Policy by limiting what pupils may distribute to what they write themselves, and by requiring pupils to use a table near the main entrance (which the court believed would create the appearance of official sponsorship that the school district wanted to avoid). *Hedges v. Wauconda Community School Dist. 118*, 807 F.Supp. 444 (N.D.Ill.1992). This extensive opinion summarizes the court's three earlier opinions, which we do not describe separately. The court awarded the plaintiffs $10 in damages (not allocating between policies) and enjoined the school district from implementing those provisions of either policy that the court had found unconstitutional. Recently the court awarded the plaintiffs attorneys' fees under 42 U.S.C. § 1988. 1993 WL 313527, 1993 U.S.Dist. Lexis 11463.

The injunction must be vacated, because all three plaintiffs have graduated. The court properly declined to certify the case as a class action, 807 F.Supp. at 451 n. 7, and these plaintiffs have no interest in prospective relief. At oral argument counsel for the plaintiffs suggested that this dispute is capable of repetition, yet evading review. The award of damages means that the legal issues will not "evade review." *Zobrest v. Catalina Foothills School District*, —— U.S. ——, —— n. 3, 113 S.Ct. 2462, 2464 n. 3, 125 L.Ed.2d 1 (1993). What is more, the "capable of repetition" aspect of the doctrine also is not satisfied because these parties will not again come into conflict over these questions. *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975). The claim for equitable relief accordingly is moot. *Board of School Commissioners v. Jacobs*, 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975).

■ Like the district court, we believe that the 1990 Policy poses little difficulty. It lumps religious speech with obscenity and libel for outright prohibition in the junior high school. Schools may not prohibit their pupils from expressing ideas. *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). And no arm of government may discriminate against religious speech when speech on other subjects is permitted in the same place at the same time. *Lamb's Chapel v. Center Moriches*

*Union Free School District,* —— U.S. ——, ——, 113 S.Ct. 2141, 2148, 124 L.Ed.2d 352 (1993); *Doe v. Small,* 964 F.2d 611 (7th Cir.1992) (in banc). See Douglas Laycock, *Equal Access and Moments of Silence: The Equal Status of Religious Speech by Private Speakers,* 81 Nw.U.L.Rev. 1, 48 (1986). The first amendment's ban on discriminating against religious speech does not depend on whether the school is a "public forum" and, if so, what kind (subjects to which we return). *May v. Evansville–Vanderburgh School Corp.,* 787 F.2d 1105, 1114 (7th Cir.1986). Even when the government may forbid a category of speech outright, it may not discriminate on account of the speaker's viewpoint. *R.A.V. v. St. Paul,* —— U.S. ——, ——–——, 112 S.Ct. 2538, 2543–45, 120 L.Ed.2d 305 (1992). Especially not on account of a religious subject matter, which the free exercise clause of the first amendment singles out for protection.

■ The 1991 Policy is more complex. First we must understand the effects of part B.6.e. Does this provision forbid all religious advocacy, as plaintiffs contend, or only religious speech that students would believe is sponsored by the school? If the former, then part B.6.e has the same failing as the 1990 Policy; if the latter, then the school district may have justification in its duty to avoid taking sides in religious controversies. The three sub-parts to B.6.e support the plaintiffs' reading. The section begins by proscribing any religious speech that students would reasonably think the school sponsors, "including but not limited to" the three categories next listed. Category (1) covers prayers, religious texts, commentaries, and similar literature; category (2) includes proselytizing material; category (3) adds "any religious material whose format would lead students to believe that the material is sponsored or endorsed by the school." A straightforward reading is that *anything* in categories (1) and (2) is forbidden—the school believes that these categories exemplify literature that the readers will believe the school sponsors, and that everything listed is therefore proscribed without any need to establish such a perception in a given case. The school district's lawyer insists that this is not so, that only poor draftsmanship led to the inclusion of "believe that the material is sponsored or endorsed by the school" in category (3) but not (1) or (2). Wauconda's Superintendent of Schools understands the policy differently. When asked by the judge at trial whether the three categories operate independently, so that "the thing that bars [literature] from distribution can be a belief that it's sponsored or endorsed by the school but that's only one of the three possibilities", Superintendent Dick replied: "That's right. That is correct." No equivocation here, no suggestion that the answer depends on how pupils would evaluate the school district's role in the utterance.

Let us suppose, however, that counsel's view of the regulation is superior. See *Frisby v. Schultz,* 487 U.S. 474, 488, 108 S.Ct. 2495, 2504, 101 L.Ed.2d 420 (1988). Then we must ask whether the school is entitled to silence its students, lest the audience infer that the school endorses whatever it permits. *Widmar v. Vincent,* 454 U.S. 263, 271–72, 102 S.Ct. 269, 275–76, 70 L.Ed.2d 440 (1981); *Board of Education v. Mergens,* 496 U.S. 226, 247–52, 110 S.Ct. 2356, 2370–73, 110 L.Ed.2d 191 (1990) (plurality opinion); and *Lamb's Chapel,* —— U.S. at ——, 113 S.Ct. at 2148, all reject arguments that, in order to avoid the appearance of sponsorship, a school may restrict religious speech. Wauconda contends that these cases are distinguishable because they involved colleges (*Widmar*) and high schools (*Mergens* and *Lamb's Chapel*), rather than junior high schools, and because the religious speech in those cases occurred in the evening rather than immediately before or after school hours. True enough, the facts are different, but nothing in the first amendment postpones the right of religious speech until high school, or draws a line between daylight and evening hours. To see whether such distinctions are implicit in the Constitution, we need to separate two questions: (a) What is the school's obligation under the establishment clause?; (b) Does this restriction on the powers of the government authorize the government to curtail private speech?

Justices of the Supreme Court are of several minds concerning the nature of a school's obligation under the establishment

clause. Four sitting justices believe that a school may not endorse any religious perspective; four others believe that a school may accommodate and even engage in religious discourse but may not impose any religious belief or act on a pupil; Justice Ginsburg has yet to address the subject. The various opinions in *Lee v. Weisman,* —— U.S. ——, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), and *Allegheny County v. ACLU,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), explore the question, which *Lee* refrains from resolving. —— U.S. at ——, 112 S.Ct. at 2655. If the no-coercion view prevails, then the establishment clause does not impose on school districts any obligation to avoid "appearances" of having religious views of their own, and there would be no corresponding entitlement to curtail private speech that might give rise to such appearances. If the no-endorsement view prevails, then school districts must keep their distance from religious sentiment. What means do schools have at their disposal to fulfil this obligation? The principal method is for administrators to avoid endorsing religious views by their own words or deeds; a prudent administrator also might disclaim endorsement of private views expressed in the schools. This combination discharges the school's obligation to be neutral toward religious sentiment. Just as a school may remain politically neutral by reminding pupils and parents that it does not adopt the views of students who wear political buttons in the halls or public officials who tout their party's achievements in the auditorium, so a school may remain religiously neutral by reminding pupils and parents that it does not adopt the views of students who pass out religious literature before school. It must refrain from promoting the distribution of such literature but can remain neutral by treating religious speech the same way it treats political speech. One school district crossed the line in *Berger v. Rensselaer Central School Corp.,* 982 F.2d 1160 (7th Cir. 1993), when it gave the Gideons preferential treatment, convened the student body to hear their presentation, and required each pupil to accept a Bible in a formal ceremony. Permitting individual students to pass out literature with religious themes, at times and places they could pass out literature with political or artistic themes, does not entail a similar preference. It is instead neutrality toward religion. Cases such as *Lamb's Chapel, Mergens,* and *Widmar* show that neutrality avoids problems under the establishment clause.

School districts seeking an easy way out try to suppress private speech. Then they need not cope with the misconception that whatever speech the school permits, it espouses. Dealing with misunderstandings—here, educating the students in the meaning of the Constitution and the distinction between private speech and public endorsement—is, however, what schools are for. After hearing conflicting expert testimony the district court found: "*Issues and Answers* by itself does not appear school sponsored and ... even junior high students probably would not think that it was school sponsored if it were passed out to them by a student standing alone on the school stairs before classes begin." 807 F.Supp. at 464. Yet Wauconda proposes to throw up its hands, declaring that because misconceptions are possible it may silence its pupils, that the best defense against misunderstanding is censorship. What a lesson Wauconda proposes to teach its students! Far better to teach them about the first amendment, about the difference between private and public action, about why we tolerate divergent views. Public belief that the government *is* partial does not permit the government to *become* partial. Students therefore may hand out literature even if the recipients would misunderstand its provenance. The school's proper response is to educate the audience rather than squelch the speaker.

Consider a parallel: the police are supposed to preserve order, which unpopular speech may endanger. Does it follow that the police may silence the rabble-rousing speaker? Not at all. The police must permit the speech and control the crowd; there is no heckler's veto. *Collin v. Smith,* 578 F.2d 1197 (7th Cir.1978). Cf. *American Booksellers Ass'n v. Hudnut,* 771 F.2d 323 (7th Cir.1985), affirmed without opinion, 475 U.S. 1001, 106 S.Ct. 1172, 89 L.Ed.2d 291 (1986). Just as bellicose bystanders cannot authorize the government to silence a speaker, so igno-

**1300**

rant bystanders cannot make censorship legitimate. Our decision in banc in *Doe v. Small* establishes this point when holding that a municipality must permit religious speech in public forums on the same terms as political speech. Accord, *Americans United for Separation of Church and State v. Grand Rapids,* 980 F.2d 1538 (6th Cir.1992) (in banc). Schools may explain that they do not endorse speech by permitting it. If pupils do not comprehend so simple a lesson, then one wonders whether the Wauconda schools can teach anything at all. Free speech, free exercise, and the ban on establishment are quite compatible when the government remains neutral and educates the public about the reasons.

■ The district court believed that the school district could curtail private speech in order to appear neutral, and it held part B.2 of the 1991 Policy, which requires pupils to distribute permitted literature from a table just inside the door of the school, unconstitutional because it might lend the school's imprimatur to speech that the school does not support. From the perspective we have adopted, this is backwards. Misperceptions of endorsement may be dealt with by steps to increase the students' understanding of our constitutional structure, and students' speech will *itself* dissipate any perception of endorsement—for students will disagree among themselves, and the audience will understand that the school does not endorse incompatible positions. Having educated its students about the difference between private and public activities, the school need not worry that providing a central place for distribution will "endorse" any speaker, any more than providing a Speaker's Corner in Hyde Park endorses each of the many users, or establishing a newsstand in a public building endorses each paper and magazine, or providing an auditorium endorses the irreverent and risqué plays produced there. See *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). A central location for distribution may help the school dissociate itself from the students' expression, because the table will be used to disseminate opposing points of view and may bear a sign reminding recipients that the

school does not endorse what the students hand out.

At this point we must ask: what kind of public forum is Wauconda Junior High School? For in a traditional public forum such as a street or park the government may not confine to tables persons who wish to distribute literature, even if tables serve purposes such as controlling congestion or litter. In limited and nonpublic forums, things are otherwise. *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). An airport may not forbid the distribution of literature, but it may designate a limited number of places from which pamphlets may be passed out, and may forbid the solicitation of contributions. Compare *Lee v. International Society for Krishna Consciousness, Inc.,* —— U.S. ——, 112 S.Ct. 2709, 120 L.Ed.2d 669 (1992), with *International Society for Krishna Consciousness, Inc. v. Lee,* —— U.S. ——, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992).

The district court's opinion contains a thoughtful discussion of the question "What kind of forum is a junior high school?" *Lamb's Chapel,* decided while the case was on appeal, answers that a school is a "nonpublic forum," —— U.S. at ——–——, 113 S.Ct. at 2146–47, which means that the school need not open its doors to the private speakers but, like the airport in *Lee,* may not adopt unjustified restrictions and may not discriminate against disfavored viewpoints or subjects (such as religion). The district court found that Wauconda Junior High School had not opened its doors wide enough to make the school a "limited public forum," 807 F.Supp. at 460–62, and this conclusion is not clearly erroneous. Whether the increasing complexity of public-forum doctrine has more to offer may be doubted. See —— U.S. —— at ——, 112 S.Ct. 2711, at 2715–20, 120 L.Ed.2d 541 (Kennedy, J., concurring in the judgment of both *Lee* cases). But see Lillian R. BeVier, *Rehabilitating Public Forum Doctrine: In Defense of Categories,* 1992 Sup.Ct.Rev. 79. We know from *Bethel School District No. 403 v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986),

that a high school may insist on civility when students speak, even though government has no such power outside school doors. See *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). Schools are (or may be) closed to non-students, and the time inside them is in most respects strictly regimented. Students must attend history class from 9:00 to 9:45, math from 9:50 to 10:35, and so on; while in each class they discuss subjects of the school's devising and not of their (or even their teacher's) preference. See *Sherman v. Wheeling School District*, 980 F.2d 437 (7th Cir.1992); *Webster v. New Lenox School District*, 917 F.2d 1004 (7th Cir.1990). Limiting distribution to a designated place is not an inappropriate rule, given the nature of the school and the principal's lawful control over pupils' behavior within. Part B.2 of the rule does not discriminate against any subject matter or viewpoint, and this record does not contain any indication that demand for access to the designated table is so great that some would-be speakers have been excluded.

The final two subjects that the parties have disputed concern part B.7. The portion of part B.7 forbidding the distribution of literature that "concerns the activities, or meetings of a non-school sponsored organization" accounts for Principal Golden's decision to rule out distribution of the "Operation Dessert Shield" broadside. The district court held that this portion of part B.7 comports with the first amendment. Plaintiffs have not appealed from this holding, so we do not discuss the subject further.

■ The other part of B.7 says that "students are also prohibited from distributing written material which is primarily prepared by non-students". Under this part no one may distribute *Issues and Answers*, or for that matter Bertrand Russell's *Why I am not a Christian* (a vigorous attack on all religion), Martin Luther King, Jr.'s *I Have A Dream* speech, or any of the Supreme Court's opinions on the meaning of the free exercise clause. This rule remains in contention because the school district has appealed from the district court's decision that its prohibition violates the Constitution. Here is the district court's explanation:

[W]e think that it is unreasonable for the School District to conclude that its educational mission will be best served by excluding nonstudent prepared materials. While in school, students read materials prepared by such famous nonstudents as Homer, Shakespeare, and (if they are lucky) Lewis Carroll. They also prepare some materials themselves. Who does not remember burning the midnight oil to complete an essay due the next day? It is clear, therefore, that teachers have long believed that students learn by both reading the preparations of others and preparing some materials themselves. After this further reflection, we conclude that it is unreasonable, contrary to the school's educational mission, and downright arbitrary to prohibit students from distributing material that is prepared by others but that the distributor wishes to adopt as his or her own. Thus, we conclude that Section B–7's prohibition on nonstudent prepared materials must be struck from the [1991] Policy.

807 F.Supp. at 464–65. Whether a school serves pupils' interests by curtailing their dissemination of leaflets prepared by third parties is not a question of constitutional law. The Constitution is not a code of education, requiring schools to adopt whatever practices judges believe will promote learning. There is a gulf between reading and analyzing Shakespeare in class under the guidance of a teacher and reading political or religious propaganda passed out in the halls; a school that embraces the former does not act "arbitrarily" by finding the latter distinct. Education is *guided* reading and analysis; the point of the distinction we have stressed between private and public acts is that the printed material pupils pass out in the halls will not be analyzed or critiqued in class as part of the school's educational program. Distinguishing the materials teachers think appropriate for classroom use from the materials students prefer to distribute is no more "arbitrary" than distinguishing *The Odyssey* from the monster movies that Odysseus' voyage inspired. Similarly it would be reasonable to exclude encyclopedia salesmen from the corridors, even though both parents and

children may find encyclopedias useful reference tools.

Plaintiffs defend their judgment with the argument that people frequently express themselves by adopting the words of others. Cf. *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (money supporting a political candidate whose views one approves is a form of expression). A city may not limit booksellers to vending the works they write themselves; a state may not exclude newspapers printed outside its borders. Certainly the school would not bar its students from handing out copies of the Constitution, although it comes from the pens of persons long dead. How then, plaintiffs ask, may a school interdict its students from distributing other expression they adopt?

That adopting the expression of others is a form of speech we freely concede. The district court found that Megan Hedges distributed *Issues and Answers* because she agreed with its contents and wanted to share her religious faith, rather than because she was put up to the job by officials of the church. 807 F.Supp. at 448 n. 4. But the junior high school is a nonpublic forum, which may forbid or regulate many kinds of speech. E.g., *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (school may give a union preferential access to its internal mail system); cf. *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). Schools routinely deny students the ability to express themselves by adopting the words of others. A student told to submit an essay about the nineteenth century Russian novel could not fulfil the obligation by assuring his teacher that he agrees with George Steiner's *Tolstoy or Dostoevsky: An Essay in the Old Criticism* (1959)—could not do so even if he turned in a brand new, store-bought copy, avoiding any charge of plagiarism or violation of the copyright laws. Learning how to express thoughts in your own words is an essential component of education, in part because exposition is a valuable skill and in part because of the tight link between the thought and its exposition. A person does not *really* understand an idea until he has experienced the process of translation, orga-

nization, and critique that is necessary to put the idea into his own words.

Learning by doing outside of the classroom is an important ingredient of education. Students write the school newspaper; they do not reprint columns by George Will and William Raspberry but may express similar thoughts in their own words. If pupils at Wauconda send letters to their representatives in Congress, we trust that they write their own rather than check the boxes of postcards preprinted by interest groups. Wauconda wants to extend this process to the materials students distribute in an effort to persuade their classmates. A school district may conclude that study and exposition improve the student, even if it diminishes the persuasive power of the result. Junior high school students are unlikely to be as effective in rhetoric as the professional writers political and religious groups engage to write leaflets. Still, hard work and self-expression bring rewards that cannot be measured in successful persuasion—rewards that a school logically may prefer. Wauconda gives students a safety valve: if they are content to pass out 10 or fewer copies, they need not undertake the labor of exposition. When they want to make a general circulation, they must use their own words or the words of a classmate. (Wauconda does not insist that each student author be the sole distributor of his essays). The proprietors of a nonpublic forum are entitled to make such choices, provided they are not arbitrary or whimsical, and Wauconda's is neither.

Part B.7 does not treat religious speech any differently from politics, literature, the arts, and other subjects. The district court found that Wauconda adopted this part out of a sincere belief that it promotes the schools' educational mission, rather than out of a desire to disfavor religious expression. 807 F.Supp. at 460; 1991 WL 222163, *9, *11, 1991 U.S.Dist. LEXIS 14873 at *33, 40–41. Thus plaintiffs cannot take whatever comfort would be available in a conclusion that the rule had an anti-religious motive divorced from an anti-religious effect. See *Church of the Lukumi Babalu Aye, Inc. v. Hialeah,* — U.S. —, —–—, 113 S.Ct. 2217, 2239– 40, 124 L.Ed.2d 472 (1993) (Scalia, J., concur-

ring); Stephen L. Carter, *The Culture of Disbelief* 111–15 (1993).

Because the district court did not allocate the damages among provisions of the 1990 and 1991 Policies, our conclusion that the whole 1990 Policy, and parts of the 1991 Policy, violate the first amendment does not lead to a clean affirmance. Apparently the district judge thought of the $10 as nominal rather than compensatory damages. Because the customary nominal award is $1, see *Carey v. Piphus,* 435 U.S. 247, 267, 98 S.Ct. 1042, 1054, 55 L.Ed.2d 252 (1978) (a nominal award is "not to exceed one dollar"), we assume that the judge intended to make cumulative awards for the several provisions of the policies he deemed unconstitutional. This implies that our different assessment of the policies will lead to a revised award. We vacate the award of damages and remand with instructions to make a new award consistent with this opinion. The injunction is vacated, and that portion of the case is remanded with instructions to dismiss as moot the plaintiffs' request for prospective relief.