**Dan LINNEMEIER, et al Plaintiffs,**

**v.**

**INDIANA UNIVERSITY—PURDUE UNIVERSITY FORT WAYNE, et al Defendants.**

**No. 1:01–CV–0266.**

United States District Court, N.D. Indiana, Fort Wayne Division.

July 20, 2001.

John R. Price, Bruce A. Stuard, John R. Price and Associates, Indianapolis, IN, for Plaintiffs.

Anthony S. Benton, Stephen R. Pennell, Barry L. Loftus, Stuart and Branigin, Lafayette, IN, for Defendants.

Kenneth J. Falk, Sean C. Lemieux, Indianapolis, IN, for Intervenor Defendant.

## MEMORANDUM OF DECISION AND ORDER

WILLIAM C. LEE, Chief Judge.

This cause is before the court upon the Plaintiffs' Complaint and Motion for Preliminary Injunction filed on July 5, 2001. On July 17, 2001, the court heard evidence and argument on the Plaintiffs' request for a preliminary injunction. After considering this evidence in addition to reviewing the briefs and arguments of counsel, the court now enters it ruling on the Plaintiffs' request for a preliminary injunction. Entered simultaneously herewith are the court's rulings on the Defendants' motions to dismiss. For the following reasons, the Plaintiffs' request for a preliminary injunction will be DENIED.

## GENERAL BACKGROUND

A group of Plaintiffs, originally including eleven residents and taxpayers of the state of Indiana and twenty-one members of the Indiana General Assembly (hereafter, "the Plaintiffs"), filed suit against the Defendants, Indiana University—Purdue University Fort Wayne ("IPFW") and ten members of the Board of Trustees of Purdue University ("the Board") (collectively, "the Defendants") pursuant to 42 U.S.C. § 1983 alleging that the Defendants will violate the Establishment Clause of the United States Constitution if they are not enjoined from presenting playwright Terrence McNally's play *Corpus Christi* (hereafter "the Play") on August 10, 2001 at the Studio Theater located in Kettler Hall on IPFW's campus. In an Order entered contemporaneously with this one, the undersigned dismissed the members of the Indiana General Assembly and various individual plaintiffs because they lacked standing to assert an Establishment Clause violation. In addition, the court dismissed IPFW because it was not a corporate entity subject to be sued under Indiana law. Finally, the court declined to exercise supplemental jurisdiction over the Plaintiffs' claim of an Indiana constitutional violation. There remain three plaintiffs of the original thirty-two and a single legal claim asserting an Establishment Clause violation. It is to this claim the court turns its attention in the instant order.

## FACTUAL BACKGROUND

The Plaintiffs seek to enjoin the Play from going forward because they believe the Play is an "undisguised attack on Christianity and the Founder of Christianity, Jesus Christ," and thus, the performance of the Play in a publicly funded,

taxpayer owned, educational facility such as IPFW violates the separation between church and state as required by the Establishment Clause.[1] The Complaint sets forth four and a half pages of alleged hostile references to Christianity and affidavits from several of the Plaintiffs in which they articulate their religious objections to the Play and their belief that the Play attacks basic tenets of Christian belief.

The Play's protagonist is a Christ-like figure named Joshua. Joshua is a young gay man from South Texas, who is surrounded by his disciples, a group of twelve gay men. Each disciple takes the name of one of the historical disciples of Christ in the New Testament of the Bible. The Play includes scenes where Joshua engages in homosexual relations with the disciples and portrays the Last Supper as a food fight.[2]

Jonathan Gilbert ("Gilbert")is a senior at IPFW majoring in theater with an emphasis in directing.[3] As part of his course work, he is enrolled in a course numbered THTR 499 bearing the description "Senior Performance Project." (Joint Stipulation, ¶ 9). According to IPFW's catalog description "all theatre majors will register for this course, which serves as the curricular capstone, during their final semester. Students will develop, with their advisor, a public performance or presentation appropriate to their area of emphasis." (Defendant's Exhibit A). For his senior project, Gilbert selected the Play with permission from IPFW faculty and plans (unless enjoined from doing so) to direct its performance at the IPFW Studio Theater.[4]

Larry Life ("Life") is employed by IPFW as a full professor of theater and Chair/Artistic Director of the Department of Theater. (Joint Stipulation, ¶ 7). In his capacity as Chair/Artistic Director, Life is responsible for supervising all activities in the Department. (*Id.*). Life testified that a student enrolled in THTR 499 must complete a "Senior Project Proposal Cover Sheet" which inquires of the student the reasons for selecting a particular project and how that student is prepared to undertake the project. This form is then submitted to a board of five Theater Department faculty members, which includes Life, for their review. According to Life, in approving a work proposed by students enrolled in THTR 499, the Theater Department relies on the neutral criteria provided by the student on the form and does not evaluate the viewpoint of the proposed work. Life further testified that the De-

---

1. Plaintiffs also make passing reference to IPFW's "Antiharassment Policy," claiming that the performance of this Play violates that policy. However, the Plaintiffs did not articulate in either their brief or at oral argument how an alleged violation of this policy adds to the legal inquiry required in this case. Moreover, the policy itself exempts speech or conduct that is protected First Amendment expression. *See IPFW Antiharassment Policy,* Preamble ("The university reaffirms its commitment to freedom of speech as guaranteed by the First Amendment to the United States Constitution. Accordingly, any form of speech or conduct that is protected by the First Amendment is not subject to this policy."). Thus, the court has not factored this allegation into the analysis.

2. It is a fair characterization of this Play that it is patently and grossly offensive to many traditional Christian beliefs and that this is the intent of the Play. The Playwright states as much in the Preface and the actor tells the audience this at the end of the Play when he says "[i]f we have offended, so be it."

3. The Theater Department has a mission statement providing that its mission is "to educate its students in the art, craft, and discipline of theatre, and is based on the belief that both production and classroom study are necessary components of a theatre education." (Defendants' Exhibit B).

4. Gilbert moved to intervene in this action but this motion was denied by the undersigned on July 12, 2001.

partment has never evaluated the viewpoint of a work proposed by a student as part of the THTR 499 course requirement and the Department remains "viewpoint neutral" as to all theater productions.

Life has worked actively with Gilbert in the production of the Play, consulting with him after a rehearsal and, at other times, regarding the technical and dramatic aspects of the direction of the Play. (Joint Stipulation, ¶ 16). Life testified that this aid is essentially "volunteer work" in that he is not required under his contract with IPFW to advise students in the summer months. Life intends to attend each rehearsal of the Play and "make suggestions" to Gilbert as to the presentation of the Play and the technical and dramatic aspects of the direction of the Play. (*Id.*)

Eleven of the thirteen actors in *Corpus Christi* are students who voluntarily auditioned for the Play. The remaining two actors are volunteers from the Fort Wayne community. Other students have volunteered to serve as lighting, set and costume designers, stage hands and ushers. (Joint Stipulation, ¶ 8). In addition, Gilbert has raised $3,000 to pay for certain costs of the Play including scripts, royalties, costumes, and props. Private donors have also provided money for two County Police officers to provide security during the six performances of the Play. The remainder of the security will be provided by IPFW through its operating budget. IPFW has invited the public to purchase tickets and attend the Play by way of a season brochure authorized and distributed by IPFW. (Joint Stipulation, ¶ 19). This brochure was funded by non-taxpayer university funds.

*Corpus Christi* is one of nine plays that IPFW plans to stage during the 2001–2002 theater season. The others include: *Bye Birdie,* by Michael Stewart, Charles Strouse and Lee Adams; *The Rivals,* by Richard Sheridan; *Atlas's Cigar,* by Betsy Breitenbach; *Protest,* by Vaclav Havel; *Harvey,* by Mary Chase; *Picasso at the Lapine Agile,* by Steve Martin; *The Vagina Monologues,* by Eve Ensler, *On the Town,* by Leonard Bernstein; and *Tennessee Williams: The Foolish Dreamer,* devised by Larry Life. (Joint Stipulation, ¶ 11). All of these plays were chosen without regard to their viewpoint.

Aside from its general theater season, IPFW also permits outside groups to utilize the Studio Theater so long as their use complies with the educational mission of the school. To date, only one outside group has utilized the Studio Theater, a group of high school students from the drama department at North Side High School in Fort Wayne. Life testified that the students were permitted to utilize Studio Theater without regard to the viewpoint of their drama presentation. He further testified that any group that desires to use Studio Theater would be permitted to do so without regard to the viewpoint of the group's presentation. IPFW Chancellor Michael Wartell ("Wartell"), likewise testified that the Studio Theater was open to outside groups without regard to the content of the speech which would occur there.[5]

The plays presented at IPFW are chosen without the intervention of Wartell. (Joint Stipulation, ¶ 22). Wartell did not read the script of the Play and did not interfere with the decision of the Theater Department to stage the Play as an academic offering. (Joint Stipulation, ¶ 23). Wartell testified that if a play "is brought up through the theater department in standard form" he would not stop it, no

---

**5.** During argument, Defendants' counsel stated "the evidence in this case is that the forum of the theater has been and there's a policy allowed to be open to the public. It is limited. It has to meet the educational mission of the university."

matter its content, unless the content was illegal. (Joint Stipulation, ¶ 25). According to Wartell, this is because there is "a general university policy, universities around the world actually, of academic freedom where administrators do not interfere with either how or what subject matter is taught in the classroom."

As a result of the controversy surrounding the Play, IPFW has taken affirmative steps to convey to the community the lack of university sponsorship of the Play. The playbill for the production will contain the following disclaimer: "This play was selected for its artistic and academic value. The selection and performance of the play do not constitute an endorsement by Indiana University Purdue University Fort Wayne or Purdue University of the viewpoints conveyed by the play." IPFW has also taken steps to permit organizations objecting to the viewpoint of the Play to make that objection known by passing out informational letters to those attending the Play. (Defendants' Exhibit D). Finally, IPFW has agreed to sponsor a public forum permitting open discussion of all viewpoints occasioned by the Play in the middle of the scheduled performance week.

### DISCUSSION

The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion..." The Fourteenth Amendment imposes this substantive limitation on the legislative power of the States, see *Wallace v. Jaffree*, 472 U.S. 38, 49–50, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985). It is the Establishment Clause which "prevents the government from promoting or affiliating with any religious doctrine or organization." *Freedom from Religion Found., Inc. v. City of Marshfield Wisconsin*, 203 F.3d 487, 490 (7th Cir.2000). The Plaintiffs contend that the performance of the Play on IPFW's campus violates this general prohibition in that the state (acting through IPFW) is improperly endorsing an attack on their religion. This court's sole role is to determine, as a legal matter, whether a preliminary injunction should issue.

"A district judge asked to decide whether to grant or deny a preliminary injunction must choose the course of action that will minimize the costs of being mistaken." *American Hospital Supply v. Hospital Products Ltd.*, 780 F.2d 589, 593 (7th Cir. 1985). "Whether a preliminary injunction should be granted by a district court generally involves a four-part analysis." *Mil-Mar Shoe Co. Inc. v. Shonac Corp.*, 75 F.3d 1153, 1156 (7th Cir.1996). "The district court begins by considering whether the moving party has demonstrated: 1) a reasonable likelihood of success on the merits, and 2) no adequate remedy at law and irreparable harm if the relief is denied." *Id.* "If the moving party clears these hurdles, the court must then consider: 3) the irreparable harm the non-moving party will suffer if the injunction is granted balanced against the irreparable harm the moving party will suffer if the injunction is denied, and 4) the public interest, i.e., the effect that granting or denying the injunction will have on non-parties." *Id.; accord Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1067 (7th Cir. 1994); *Wisconsin Music Network v. Muzak Ltd.*, 5 F.3d 218, 221 (7th Cir.1993).

"This 'sliding scale' approach followed in this circuit balances the degree of likelihood of success on the merits against the irreparable harms." *Vencor, Inc. v. Webb*, 33 F.3d 840, 845 (7th Cir.1994). "Thus, the more likely the moving party will succeed on the merits, the less the element of irreparable harm must weigh in its favor." *Id.* "Similarly, the less likely that the party seeking the preliminary relief will have success on the merits, the greater the

element of irreparable harm required to weigh the balance in its favor." *Id.* (*citing, Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 12–13 (7th Cir.1992)). With these factors in mind, the Court now turns to the Plaintiffs' request for a preliminary injunction.

### 1. *Plaintiffs' Likelihood of Success on the Merits*

■ This case implicates two fundamental principles of our Constitution. The First Amendment requires caution from the government to "abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction," *Rosenberger v. Rector and Visitors of University of Virginia,* 515 U.S. 819, 827, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). At the same time, the First Amendment prohibits the government, through its speech, from "coerc[ing] anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith or tends to do so.'" *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)(quoting *Lynch v. Donnelly,* 465 U.S. 668, 678, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984)). The Plaintiffs claim the latter has occurred in this case; the Defendants' assert the former is at work. It is this court's task to reconcile the two views.

The hallmark of the Establishment Clause inquiry is whether the government "convey[s] or attempt[s] to convey a message that religion or a particular religious belief is favored or preferred." *Wallace,* 472 U.S. at 70, 105 S.Ct. 2479. "There is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Board of Education of the Westside Community Schools v. Mergens,* 496 U.S.

226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990). This distinction leads the court to the fundamental question presented by the parties in their arguments and briefs, that is, who is the speaker in this instance? This determination is critical for "when the government speaks, either directly or through private intermediaries, it is constitutionally entitled to make 'content based choices' and to engage in 'viewpoint based funding decisions.'" *Wells v. City and County of Denver,* 257 F.3d 1132 (10th Cir.2001) (quoting *Legal Serv. Corp. v. Velazquez,* 531 U.S. 533, 121 S.Ct. 1043, 1048, 149 L.Ed.2d 63 (2001)). In contrast, when the speech is private speech, the government may not regulate it in the same way it regulates its own speech, particularly where the government has evinced either " 'by policy or by practice' any intent to open [school facilities] to 'indiscriminate use...'" *Hazelwood School Dist. v. Kuhlmeier,* 484 U.S. 260, 270, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988).

The Plaintiffs assert that the speech at issue here, i.e., performance of the Play, is government sponsored speech or, at the very least, speech which conveys a message of endorsement or disapproval of religion regardless of its actual purpose. Plaintiffs rely primarily on the fact that the speech will occur on government property and be aided by utilities paid for from a taxpayer funded university account, to support this assertion. However, "not every message delivered [on government property at government-sponsored school-related events] is the government's own." *Santa Fe Independent School District v. Doe,* 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000). Indeed, the Supreme Court has upheld private religious speech on government property in numerous cases. *See Good News Club v. Milford Central School,* —— U.S. ——, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) (private

Christian club permitted to meet on school property); *Rosenberger,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (university student organization which published Christian newspaper entitled to university funding the same as other student organizations); *Lamb's Chapel v. Center Moriches Union Free School District.,* 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (church permitted to use school facilities for religious oriented film series on family values and child-rearing); *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (members of registered religious group at state university permitted to use university facilities).

Plaintiffs distinguish these cases by claiming that the particular facts of this case demonstrate that the Studio Theater in Kettler Hall is a nonpublic forum. If they are correct, the test becomes that articulated in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) which requires this court to examine (1) whether the government activity in question has a secular purpose; (2) whether the activity's primary effect advances or inhibits religion; and (3) whether the government activity fosters an excessive entanglement with religion. *Id.* at 612–613, 91 S.Ct. 2105. If they are wrong, the aforementioned cases (*Good News Club, Rosenberger, Widmar, and Lamb's Chapel*) are controlling and foreclose their contention that the speech in this case gives the appearance of government endorsement of a religious (or anti-religious) viewpoint.

Having reviewed the evidence presented at the preliminary injunction hearing, the court concludes that the teachings of *Good News Club, Rosenberger, Widmar, and Lamb's Chapel* must inform the court's decision in this case and, when the evidence is considered in light of those cases, it conclusively demonstrates that the plaintiffs have little chance of prevailing on the merits.

The evidence shows that IPFW has evinced by both policy and practice an intent to open the Studio Theater to both the student body and the public at large. As part of its theater department curriculum, IPFW permits students to utilize Studio Theater to stage a "public performance" thereby creating a limited forum for its students. In addition to making its theater open to its students, two university administrators testified that any group who desires to utilize Studio Theater would be permitted to do so on a viewpoint neutral basis so long as the group's activities comport with the educational mission of the university. At least one outside group, North Side High School's drama organization has done so. These facts, the court believes, clearly establishes that IPFW has created, at the very least, a limited public forum in the Studio Theater.[6]

---

**6.** At oral argument, Plaintiffs' counsel stated that "[o]ne high school one time does not a limited open forum make." This court cannot agree. A forum does not becomes any less open simply because only one group chooses to take advantage of the opportunity to use it. See *Summum v. Callaghan,* 130 F.3d 906 (10th Cir.1997) (Installation by private fraternal organization of monolith that espoused organization's views was sufficient to transform lawn of county courthouse into "limited public forum," for First Amendment purposes; by allowing access to one organization, county opened forum to at least some private expression); cf. *Good News Club,* —— U.S. at —— n. 9, 121 S.Ct. at 2107 n. 9 ("When a limited public forum is available for use by groups presenting any viewpoint, however, we would not find an Establishment Clause violation simply because only groups presenting a religious viewpoint have opted to take advantage of the forum at a particular time.").

Having created a public forum, IPFW may not discriminate against the viewpoint of those speaking within the very forum they created without violating the First Amendment's free speech guarantee. *See generally, Good News Club,* ––– U.S. –––, 121 S.Ct. 2093, 150 L.Ed.2d 151; *Rosenberger,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700; *Lamb's Chapel,* 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352; *Widmar,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440. The Supreme Court teaches that "a significant factor in upholding governmental [action] in the face of Establishment Clause attack is their neutrality towards religion." *Good News Club,* ––– U.S. at –––, 121 S.Ct. at 2104 (quoting *Rosenberger,* 515 U.S. at 839, 115 S.Ct. 2510). "[T]he guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." *Id.; see also Hedges v. Wauconda Community Unit School,* 9 F.3d 1295, 1298 (7th Cir.1993) (citing *Widmar, Mergens,* and *Lamb's Chapel* and stating that these cases "reject arguments that, in order to avoid the appearance of sponsorship, a school may restrict religious speech."). Viewpoint neutrality by the university is precisely what the evidence shows in this case. Life testified that viewpoint is never considered in determining theater productions nor is it a factor in approving particular student projects, such as the one in this case, or outside performances to be performed in the theater by other groups. Thus, the university has done all that the Constitution requires of it and it cannot be said to

have violated the Establishment Clause. See *Hedges,* 9 F.3d at 1299 ("neutrality avoids problems under the establishment clause.").[7]

■ Plaintiffs emphasize, however, that the question in this case is whether there is a "perception or message of endorsement" occasioned by the Play's performance on a public university campus. In support of this proposition, the Plaintiffs analogize the instant case to cases where courts have found religious statues or monuments to violate the Establishment Clause when they are situated on government property, see *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989); *Books v. City of Elkhart,* 235 F.3d 292, 305 (7th Cir.2000); *American Jewish Congress v. City of Chicago,* 827 F.2d 120 (7th Cir. 1987). In each of these cases, the courts concluded that because the religious statute or monument was situated in a building that was the heart of the city or county's government such as a municipal building or county courthouse, its placement created the perception of endorsement by the government itself. *See County of Allegheny,* 492 U.S. at 599–600, 109 S.Ct. 3086 (creche displayed on the main and most beautiful part of the county courthouse perceived as promoting a government message, "no viewer could reasonably think that it occupies this location without the support and approval of the government."); *American Jewish Congress,* 827 F.2d at 128 (city's display of a creche during the holiday season in the lobby of the city-county building was "a setting where the presence of the gov-

7. The Seventh Circuit in *Hedges* also stated: School districts seeking an easy way out try to suppress private speech. Then they need not cope with the misconception that whatever speech the school permits, it espouses. Dealing with misunderstandings—here, ed-

ucating the students in the meaning of the Constitution and the distinction between private speech and public endorsement—is however, what schools are for.
*Hedges,* 9 F.3d at 1299.

ernment is pervasive and inescapable."); *Books*, 235 F.3d at 305 (finding monument of Ten Commandments displayed "at the seat of government" to be " 'so plainly under government ownership and control' that every display on its property is marked implicitly with governmental approval.").

What these cases, and many others, firmly hold is that the court must look to the unique facts and circumstances presented to determine whether a reasonable person would perceive the performance of the Play to be a government endorsement or attack on religion or a particular religious belief. *Capitol Square Review and Advisory Board v. Pinette*, 515 U.S. 753, 778, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995).[8] In each of the monument cases, there was no question that the facts and circumstances in those cases, particularly the location of the monument itself, created a perception of government endorsement. Taking into account the unique facts and circumstances of this case, however, the court concludes that the performance of this Play on a public university campus is not, as Plaintiffs' contend, akin to a monument's placement "at the seat of the government." Indeed, the fact that the Play will be performed on a state university campus greatly distinguishes it from the cases cited above and would not create the perception of government endorsement in a reasonable observer.

A university setting is a place where "the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." *Rosenberger*, 515 U.S. at 834, 115 S.Ct. 2510. It is a "hub of ideas" and a place citizens traditionally identify with creative inquiry, provocative discourse, and intellectual growth. When considered in this context, the Play falls squarely within this general notion of subjects accepted by the public for a university.[9] The key is isolating the fact that the university permits speech from the concept that it endorses all the speech it permits. Indeed, the Supreme Court instructs that "[t]he proposition that schools do not endorse everything they fail to censor is not complicated." *Mergens*, 496 U.S. at 250, 110 S.Ct. 2356.

Moreover, to the extent the university makes it clear that its recognition of the right to perform the Play is not an endorsement of the Play's viewpoint, it has isolated itself from the challenged speech, *see Mergens*, 496 U.S. at 251, 110 S.Ct. 2356 ("To the extent a school makes clear that its recognition of respondents' proposed club is not an endorsement of the views of the club's participants, students will reasonably understand that the school's official recognition of the club evinces neutrality toward, rather than endorsement of, religious speech."), making it less likely that the public would inter-

---

**8.** Having observed the Plaintiffs' testimony at the preliminary injunction hearing it is clear that they sincerely and validly perceive the performance of the Play to be a message attacking their religious beliefs. However, the endorsement inquiry is "not about the perceptions of particular individuals or saving isolated nonadherents from . . . discomfort." *Good News Club*, — U.S. at —, 121 S.Ct. at 2106. The law requires the court to go beyond the particularized perceptions of individuals and inquire into the mind of a reasonable observer "deemed aware of the history

and context of the community and forum in which the religious [speech takes place]." *Id.*

**9.** Even in the larger context of the university setting, it is clear that IPFW permits a wide array of speech, including pro-Christian speech, to take place on its campus. Chancellor Wartell testified that a Catholic Bishop performs mass weekly on campus, Campus Ministries is a Christian organization existing on campus and there are prayer groups that exist on campus.

pret the Play as a government endorsement of its viewpoint. This is precisely what IPFW has done by placing a disclaimer in its playbill which reads: "This play was selected for its artistic and academic value. The selection and performance of the play do not constitute an endorsement by Indiana University Purdue University Fort Wayne or Purdue University of the viewpoints conveyed by the play," and permitting other organizations to distribute literature to theatergoers. In addition to these efforts, IPFW plans to hold a public forum in the middle of the Play's performance week to permit contrary viewpoints to be heard. Each of these efforts further emphasizes the lack of government sponsorship and endorsement of the speech to the public and highlights the academic exercise with which the university is charged under state law.

In sum, the open nature of the forum in this case in tandem with the history and context of the university setting in which the performance will occur highlighted by the steps the university has taken to disassociate itself from the speech in question leads to the conclusion that the Plaintiffs have failed to sustain their burden of demonstrating a substantial likelihood of success on the merits of their Establishment Clause claim.

### 2. Irreparable Harm for which there is no Adequate Remedy in the Law

■ The inquiry, however, does not end here. The court must weigh the likelihood of success on the merits against the allegation of irreparable harm to the Plaintiffs that might yield from the challenged conduct. Anyone observing the demeanor and testimony of the Plaintiffs at the hearing would easily discern that the Plaintiffs will suffer irreparable harm if the production goes forward. "Since undoubtedly we are a 'religious people whose institutions presuppose a Supreme Being,' deep feelings are aroused when

aspects of that relationship are claimed to violate the injunction of the First Amendment that government may make 'no law respecting an establishment of religion, or prohibiting the free exercise thereof.'" *School District of Abington Township v. Schempp,* 374 U.S. 203, 230, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). It is equally clear that because this case involves deeply rooted spiritual beliefs and personal sentiment that there is no adequate remedy at law should a constitutional violation exist. Thus, plaintiffs have demonstrated a substantial likelihood of irreparable harm.

### 3. Balance of Interests

■ The balance of interests addresses the remaining two elements of the preliminary injunction inquiry; the irreparable harm the non-moving party will suffer if the injunction is granted balanced against the irreparable harm the moving party will suffer if the injunction is denied as well as the interests of non-parties, e.g., *Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 11–12 (7th Cir.1992).

As the court indicated above, the consequences of erroneously denying injunctive relief are great in that the Plaintiffs will, without question, be irreparably harmed. In turn, the consequences of erroneously granting such relief are equally great in that the court would be requiring the Defendants to curtail the free speech rights of one of its students thereby causing irreparable harm. *See Good News Club,* —— U.S. at ——, 121 S.Ct. at 2106 ("There are countervailing constitutional concerns related to the rights of other individuals in the community. In this case, those countervailing concerns are the free speech rights of the Club and its members.").

There is likewise a threat of substantial harm to the public and local community should the court enjoin the Play's performance. The public has an interest in par-

ticipating and viewing this controversial speech and in the free exercise of thoughts and ideas which this case implicates. This is of particular concern here given the slim chance Plaintiffs have of succeeding on the merits and so this factor, in addition to the harm to the Defendants if an injunction is granted, tends to weigh in favor of denying injunctive relief.

### 4. *Application of Sliding Scale*

Having analyzed each of the factors which must be established for issuance of a preliminary injunction, on balance, the court concludes that the Plaintiffs cannot prevail on their request for a preliminary injunction. Applying the flexible "sliding scale" as the court must, the court's preliminary view of the merits points strongly in favor of the Defendants and is counterbalanced by the irreparable harm to be suffered by the Plaintiffs. However, when the substantial risk of irreparable harm to non-parties and the public is factored into the equation, the balance tips in favor of denying the injunction.

### CONCLUSION

The Plaintiffs' motion for preliminary injunction is DENIED.